State *v.* Stebbins.

## STATE *vs.* LEWIS STEBBINS, ANDREW L. ROBERTS, AND PORTER KELLOGG.

There is no rule of law that requires absolutely that the testimony of an accomplice should be corroborated. The jury may, if they think proper, convict upon such evidence alone.

The whole extent of the rule is this,—that such testimony is to be regarded as of a suspicious character, and ought to be specially scrutinized by the jury, and made the subject of particular caution to the jury on the part of the court.

And so important is it that the jury should be cautioned with regard to it, that it is regarded as a clear omission of duty on the part of the court if it neglects to do it.

An accomplice in a theft testified that, after the theft, on a certain day named, he was at the house of one of the prisoners, who told him that he had received, by exchange of some of the stolen property, $500 in gold, which he was going that day to loan to *B.* The witness also described the interior of the house. To corroborate his testimony, the evidence of *S* was introduced, who testified that he had since been in the house of the prisoner and that it answered the description given, and that he found there a note of *B* to the prisoner for $500, dated on the day named by the accomplice. The evidence of *B* was also offered, who testified that on the day named he borrowed $500 in gold of the prisoner and gave his note for it. Held, that the evidence of both was admissible.

The same accomplice testified that, on a certain day named, he went with one of the prisoners to a bank in Boston, to get four $50 bills of the Alfred Bank (a part of the proceeds of the stolen property) exchanged for other bills, and that he remained upon the side walk while the prisoner went in, and that on coming out the prisoner told him that he had exchanged the bills. The teller of the bank was afterwards called, and testified that, about the time stated, a stranger came into the bank and exchanged four $50 bills of the Alfred Bank, but he was not able to identify either of the prisoners as the person. Held that, even if the evidence was not admissible to corroborate the testimony of the accomplice, yet as the fact was in itself a relevant one, and was connected with the prisoner by the testimony of the accomplice, it was admissible as direct evidence.

A box found in the possession of one of the prisoners and claimed to have a certain relation to the theft, was introduced in evidence, and on examining it before the jury there was found, in a secret place in the lid, a quantity of bank bills, which were supposed to be counterfeit. These were not exhibited to the jury, or commented on by the counsel for the state, but the box was, by order of the court, and against the objection of the prisoners, delivered to the jury just as it was, and taken to their room. Held, that this course was proper.

The information in one count charged the defendants with a theft committed on the railroad cars "between Westport and Norwalk, two of the stations of the New York and *Norwalk* Railroad Company." After the jury was impanneled and the trial had commenced, the attorney for the state moved to amend the information by inserting the word *New Haven* in the place of *Norwalk* in the description of the railroad company, which, against the objection of the prisoners,

State *v.* Stebbins.

was allowed by the court. There were three other counts in the information in which the railroad was properly described. Held, that the amendment was properly allowed.

Where an information fails through a variance, a verdict of acquittal would not benefit the defendant, as he might be again informed against by the attorney for the state. It is our practice therefore to allow an amendment in such a case after a trial has commenced, the court in its discretion allowing reasonable delay, if requested by the defendant.

It is otherwise where the information contains no such defect, but the attorney for the state is unable to bring the proof necessary for a conviction. In this case the attorney has no right to withdraw the prosecution and commence another, but the defendant is entitled to an acquittal.

Where there are several counts in a criminal information, and a general verdict of guilty, the conviction will be sustained if there is any sufficient count.

This is the English rule, as well as that of this state, though in England the rule is confined to criminal cases, while with us it is extended to civil cases.

INFORMATION FOR THEFT. The prisoners were charged with having feloniously taken an iron safe or chest belonging to an express company, from the railroad cars of the New York and New Haven Railroad Company, in which it was being conveyed, with a large amount of bank bills and other valuable property contained in it. The information contained four counts, in the third of which the place where the felony was committed was described as " between Westport and Norwalk, two of the stations of the New York and *Norwalk* Railroad Company." The defendants pleaded severally not guilty.

Upon the trial, after the jury were impanneled and sworn, and witnesses had been called and testified, the attorney for the state moved to amend the information by striking from the third count the word " Norwalk," and inserting in its place the word " New Haven." To this motion the counsel for the prisoners objected, on the ground that the information could not be amended after the jury were sworn and evidence had been received. The court overruled the objection and allowed the amendment, and the counsel for the prisoners excepted. The evidence that had been received before the amendment was permitted by the court to go to the jury without further objection.

The attorney for the state offered evidence to prove, and it was not denied, that there was in the stolen safe at the time

of the theft, among other things ten $500 bills of the Atlantic Bank of Boston, in a pouch or pocket-book afterwards produced in court and identified. The attorney offered as a witness one Kinney, an accomplice of the prisoners, who testified to the commission of the theft at the time and place alleged, and the participation of the prisoners therein; and, among many other things, testified that the theft had been planned for two years and attempted several times, and that he had several consultations with Stebbins and Roberts, both separately and together, as to the time and mode of accomplishing it, and that he went with Roberts along the line of the railroad twelve or fifteen times to assist Stebbins, who was in the employment of the railroad company and went in the cars, in accomplishing it; that Roberts told him on one occasion that he had a box prepared to resemble the safe, and that he, the witness, had seen such a box in Roberts' house; that on the night of the theft the money taken from the safe was buried in three parcels near by, and that subsequently he went with Roberts a number of times to the place and searched for the money, but that they were unable to find one of the parcels for a considerable time, and that Stebbins once went up and searched for this parcel, while he was off the cars for a fortnight or so during the last summer; that he and Roberts went up twice on the steamboat to Bridgeport with a pair of horses, and that they stopped to see a Mr. Crane in Bridgeport, and went from there to the place of the theft; that on one occasion he and Roberts went up with a gray and a black horse and a light buggy, and after searching some time they found a part of the money, and went to the Connecticut Hotel in Norwalk and spent the night, and went from there to New York the next morning; that Stebbins on one occasion told him that he had received from Roberts $1000, and a check for $500, for which he had obtained the gold, and also one $500 bill on the Atlantic Bank, and four $50 bills on the Alfred Bank, which he had given to Kellogg; that in September, 1860, Roberts proposed to him that they should go to Alfred, Maine, and exchange nine of the $500 bills which he had for other money, and that he objected, and that Roberts told him

that he had exchanged some money at the bank there in August, and that the president and cashier were intimate with him, that he had procured four $500 bills of the Atlantic Bank, new issue, and had exchanged with them to see if they would notice that they were of the same kind as those stolen, and that they did not say a word about it, and that it would be safe to exchange the bills there; that it was agreed, at the suggestion of Roberts, that he should go by the name of Baker, and that they should treat each other as strangers when they arrived and while in Alfred; that in pursuance of an arrangement with Roberts, they started for Alfred, September 18th, 1860, in the afternoon, in the steamboat for Fall River; that Roberts bought tickets for both, and they occupied the same state-room; that they arrived in Boston the next forenoon and stopped and took dinner at the American House, and Roberts wrote his name on the register; that while in Boston that day they called on Stebbins at his house, which the witness particularly described, especially by certain pictures, band-boxes and other articles, and that while there Stebbins told them he had loaned, or was to loan that day, $500 to a flour dealer in Boston; that they went to the Atlantic Bank there, and Roberts went in while he remained on the side-walk, and when he came out he informed him that he had exchanged four $50 bills of the Alfred Bank for $200 in small bills of the Atlantic Bank; that the same afternoon they went to Alfred, arriving there in the evening, and rode together in a carriage from Kennebunk, the nearest railroad station, and the hotel being full, they staid at the house of a brother of Roberts, and slept in the same bed; that the next morning he was introduced by the brother to Stimpson, cashier of the Alfred Bank, by the name of Baker, and as a man who wished to purchase a horse or some horses; that he took dinner with Roberts at the house of his brother; that after dinner Roberts gave him the nine $500 bills, and the $200 in small bills on the Atlantic Bank, and then he went with the brother to the Alfred Bank, and was introduced by him to Mr. McIntyre, the president, by the name of Baker, and that he then exchanged with McIntyre all the money for bills of the Alfred Bank, the most

of which he gave to Roberts, and immediately left for New York, without Roberts, and stopped in Boston that night at the United States Hotel and registered his name as Baker.

The attorney for the state then offered as a witness Charles H. Ward, teller of the Atlantic Bank, who testified that in the month of September, 1860, a man whom he did not know came into the bank and changed with him four $50 bills of the Alfred Bank. To this evidence the defendants objected, on the ground, 1st. That it was irrelevant. 2d. That neither of the prisoners was identified by the witness as the person who changed the bills. The court overruled the objection and admitted the testimony, and the counsel for the prisoners excepted. The witness also testified that, on the 27th day of June, 1860, the Atlantic Bank issued five hundred dollar bills from a new plate, called the new issue ; that of the bills of that denomination of the old issue, only twenty-six were outstanding on the 18th of April, 1860, and that of those, eight more were returned to the bank through the clearing house on the morning of the 19th of April, leaving only eighteen then outstanding, and of these seven more were returned into the bank soon afterwards, and that on the 22d of September, 1860, nine more were returned from the Union Bank, through the clearing house, and that three were still outstanding.

The prisoners denied, if it was true that Kinney and Roberts went to any house in Boston, as testified by Kinney, that it was the house of Stebbins. The attorney for the state called Henry Sanford as a witness, who testified that he was in Stebbins' house in Boston about the first of November, 1860, and that there were in it the articles described by Kinney. The prisoners objected to this testimony, but the court admitted it, and the prisoners excepted. The same witness also testified that he found in Stebbins' house a note of Bosworth & Co. of Boston, dated September 19, 1860, payable to Stebbins, for $500. The attorney for the state also offered as a witness Charles E. Bosworth, who testified that he was a member of the firm of Bosworth & Co., flour dealers in Boston, and that the firm borrowed of Stebbins $500 in gold on the 19th of September, 1860, and gave him their note for it of that date.

To this testimony of these two witnesses the prisoners objected on the ground that it was irrelevant and incompetent as confirmatory of Kinney, but the court overruled the objection, and admitted it, and the prisoners excepted.

John Hayes, a witness called by the attorney for the state, testified that he found the pocketbook under a bridge between Norwalk and Westport, at the place designated by Kinney in his testimony as the place where it had been hidden. Upon objection being made to this testimony by the prisoners, the court admitted it to prove, so far as it might tend to prove, the fact, place, and circumstances of the theft, and for no other purpose.

The attorney for the state produced in court a safe, and claimed to have proved that it was identical in size and appearance with the stolen safe, which had been broken up; and also produced in court a dark green wooden box, and proved that the same was found in its then condition at the time of Roberts' arrest, in his room in the house where he boarded, and claimed that it was made to resemble, and did in fact exactly resemble, the stolen safe in size and general appearance, and that it was intended to be used in the perpetration of the theft. The prisoners offered evidence to show when the box was made, and that it was made and used for a lawful purpose. Upon the box being exhibited to the jury and opened, there was found a secret place in the lid, in which there appeared to be bank bills, apparently concealed, and which were supposed to be counterfeit; and upon objection being made by the prisoners, they were not exhibited to the jury, but remained in the place where they were found, and no comments were made upon them by any of the counsel in their arguments to the jury. After the charge to the jury, the box, against the objection of the prisoners, was delivered by order of the court to the jury, in the precise condition in which it was found in Roberts' house and was offered in evidence, and by them conveyed to the jury-room.

The jury rendered a verdict of guilty against all the defendants, and they moved for a new trial.

*Loomis* and *Sturges*, in support of the motion.

1. The amendment was improperly allowed. The change was an important one, and if not made the variance would have been a fatal one. We do not deny the right of the court, under our statutes, to allow such an amendment before the jury are impanneled; but after the jury are impanneled and sworn no amendment whatever can be made. The reason is that the prisoner has answered to the information as it stands and the jury have been sworn to try the issues as presented. An attorney for the state can not enter a *nolle prosequi* after the jury have been sworn, without the consent of the prisoner. If the attorney is not then prepared to proceed with the trial the prisoner is entitled to an acquittal. No man can be put upon his peril twice upon the same criminal charge. If the prosecuting attorney could not have entered a *nolle*, then equally may he not alter the information and make it substantially a new one. If the prisoner can not be convicted on the information as it stands when the trial commences, he is entitled to an acquittal. The allegation as to the place where the theft was committed was unnecessary, but having been made was material. *Rex* v. *Wilkes,* 4 Burr., 2527. *Rex* v. *Charlesworth,* 2 Stra., 871. *State* v. *McKee,* 1 Bailey, 651. *Reynolds* v. *The State,* 3 Kelly, 53. *Commonwealth* v. *Tuck,* 20 Pick., 356. *Mount* v. *The State,* 14 Ohio, 295. 2 Graham & Wat. on New Trials, 134. 2 Swift Dig., 386.

2. The evidence offered as confirmatory of the testimony of Kinney the accomplice was inadmissible. *Rex* v. *Webb,* 6 Car. & P., 595. *Rex* v. *Wilkes,* 7 id., 272. *Regina* v. *Farler,* 8 id., 106. *Regina* v. *Birkett,* id., 732. *Commonwealth* v. *Bosworth,* 22 Pick., 397.

3. The box with the bank bills was improperly allowed to go to the jury. The jury were left to examine the bills, which had never been brought before them in evidence. They might draw inferences unfavorable to the prisoners which the latter had no opportunity to repel.

*Ferris,* state attorney, and *Beardsley,* contra.

1. The amendment was properly allowed. The question

is wholly different from that with regard to the right of the prosecuting attorney to enter a *nolle*. In that case the prosecution is withdrawn merely to be commenced again, which the prisoner may justly object to. But here, if the variance was material, the prisoners were not twice put in peril upon the same charge, for by the alteration of the information it became substantially a different charge, a new information for which would not be barred by an acquittal, on the ground of the variance, upon the first one. It has always been the practice in this state to allow amendments of informations, even of a material character, at any stage of the trial, the court allowing delay if justice to the prisoner requires it. The reason why indictments can not be amended is because they are presented by a grand jury, and the prosecuting attorney has no power to change them, even before the prisoner has been put to plead. But informations being filed by the prosecuting attorney, this objection does not apply. But the amendment here was merely of a clerical error, the meaning being apparent. It was but a part of the description of the place where the theft was committed, the allegation that it was between Westport and Norwalk making it still sufficiently accurate.

2. The evidence objected to was properly admitted. Most of it was admissible as direct evidence, and it was not indispensably necessary that the testimony of Kinney the accomplice should be corroborated. If it was, the evidence was admissible for that purpose. *State* v. *Wolcott*, 21 Conn., 272.

3. The box was properly sent to the jury. There is no evidence that they examined the bills. If it was proper that it should go to the jury at all, which is not denied, it ought to have gone to them just as it was.

ELLSWORTH, J. The first ground upon which a new trial is claimed, is that after the jury were impanneled and sworn and the trial commenced, the information was amended by erasing the word *Norwalk* in the description of the railroad company in the third count, and inserting in its place the word *New Haven*.

We are not satisfied that this alteration was of any import-

State *v.* Stebbins.

ance in itself. The former word was used only as a part of the description of the place where the offense was committed, and as the place was more fully described as being between Westport and Norwalk, we think it was sufficiently described notwithstanding the error in this incidental part of the description. The substitution of the word *New Haven* for *Norwalk* in the mere description of the railroad upon which Westport and Norwalk were situated, was therefore of very little importance, and could not prejudice the defendants.

Besides, there were other counts quite sufficient to proceed with the trial upon, which have not been altered, and had the prisoners' counsel wished to test the sufficiency of those counts, they could have called for a verdict on them specifically. It is of no importance now, for one good count is sufficient, according to the English and our own law, upon a general verdict; and in this state the law is the same in civil and criminal trials, though it is otherwise in England.

The great objection which has been pressed upon us for a new trial is, however, that no amendment of the information whatever could be allowed after the trial had begun, because, in criminal cases, after the trial has once commenced, the prisoner has a right to insist upon a verdict from the jury, so that he may not be put in jeopardy a second time. The law is undoubtedly so, as a general rule; and so it was adjudged in the case of *United States* v. *Porter*, in the circuit court of the United States at Hartford, reported in 3 Day, 283; but the rule is of no importance in a case situated as this is. A verdict of acquittal on this third count, even if it was the only one in the information, and contained a material variance in its statement of the crime intended to be prosecuted, would do the prisoner no good; for a new information could be filed immediately, avoiding the variance. It would be otherwise if the description was correct, and the prosecution was likely to fail because of the want of proof to sustain it. Then, of course, the prisoner could object to a *nolle prosequi* ; for if he could not, the attorney for the state could file a new information, and put the prisoner in jeopardy for the same offense as often as he pleased. In any case the court may, in the exercise of its discretion, grant delay or a continuance of the

cause. But when the prisoner has been put on trial for the real offense, and no good reason for delay or continuance appears, the prisoner is entitled to have the trial go on; for a verdict in his favor will be a bar to a future prosecution against him on the same matter. Practically, the objection of variance will avail the prisoner so little, that it is customary in our courts generally for the prosecutor to amend and go on with the trial without a re-examination of the witnesses, unless such re-examination is claimed by the prisoner, which was not the case here.

It is further objected that the testimony of Charles H. Ward, teller of the Atlantic Bank at Boston, should not have been received, on the ground that it was irrelevant, and because the witness did not identify the prisoner as the person who exchanged the bills at the bank.

These objections do not appear to us to have any great weight. The evidence conduced to establish certain facts claimed to be material, and was claimed to be corroborative of the testimony of Kinney the accomplice, who had testified that Roberts and Stebbins were active with himself in planning and executing the felony for which they were on trial, and in appropriating the booty taken, including certain bills of the Alfred Bank—that he and Roberts went to Boston in September, where they met Stebbins at his house, (describing its appearance within,) and had a conversation on the subject, and that Roberts while there went to the Atlantic Bank and got four fifty dollar bills of the Alfred Bank changed for $200 in small bills—and that they then proceeded, with the $200 thus obtained and with nine of the ten $500 of the Atlantic Bank stolen, to Alfred, in the state of Maine, where the witness got them changed—not only the nine large bills, but the smaller ones also, which the prosecutor claimed were the avails in part of the other $500 note, not found after the theft was committed in their hands. All this testimony was deemed material to show the participation of Roberts in the crime committed, and if Kinney could testify to the facts, as he did without objection, they could of course be testified to by Ward, so far as any part of them came within his knowledge.

The exchange of the four $50 bills for $200 in smaller ones was a part of this testimony, and we think it is not to be rejected as wholly irrelevant. The evidence went to prove the complicity of Roberts in the felony, and particularly that he had in his hands the nine large bills which had been stolen, and the $200 in smaller ones, which he handed to Kinney at Alfred, as the joint property of the three, and which $200 had been before obtained from the Atlantic Bank by some person. Ward testified that in September, (as Kinney had said,) a man came to his bank with four $50 bills and exchanged them for $200 in small bills, but he could not say that it was Roberts, whom he did not know; but Kinney swore that it was Roberts, for he accompanied him to the door of the bank for the purpose testified to by Ward. Taking the testimony together, it is unobjectionable in our view as testimony in chief, to prove the guilt of Roberts.

But the chief purpose of the evidence of Ward was, we suppose, to corroborate Kinney; the rule of law being, that an accomplice, to be entitled to full credit, ought, as far as possible, to be corroborated by further proof. Not that this is an unbending technical rule, or that an accomplice may not be credited in what he says without such further proof, for we entertain no doubt that without it a jury may be satisfied of the guilt of a prisoner, and that they may convict where they have not a reasonable doubt of his guilt, as this court held in the case of *The State* v. *Wolcott*, 21 Conn., 272; but the whole extent of the rule is this, that such testimony is of a suspicious character, and calls for scrutiny on the part of the jury, and for a particular caution to the jury on the part of the judge in his charge. The evidence, if standing alone, is not to be rejected, and whether corroborated or not, (and to what degree it needs corroboration the jury must judge,) may be sufficient to satisfy the minds of the jury. So important however is it that the jury should be cautioned as to the weight of the evidence by the court, that to omit it is now held a clear omission of judicial duty, and becomes a ground, perhaps, for granting a new trial. Roscoe Crim. Ev., 144. 1 Greenl. Ev., § 380. *Commonwealth* v. *Bosworth*, 22 Pick.,

397. What the judge said to the jury in this case we do not know, but we may assume that he did his duty, as there is no complaint on this ground in the motion.

We do not understand that the English cases, (which are rulings on the circuit,) so earnestly pressed upon our consideration by the counsel for the defendants, contain any different doctrine from that which we have laid down. By reference to Taylor's late treatise on evidence, we shall find that the practice in England at the present time agrees with what we have stated to be our own. Indeed Taylor makes. use of the very language of Mr. Greenleaf on this point. " There is no such rule of law, it being expressly conceded that the jury may, if they please, act upon the evidence of the accomplice without any confirmation of his statement." 1 Greenl. Ev., § 380. The cases, as we regard them, go only to the duty of the court in submitting such evidence to the jury, though some of the judges state what rule they, if acting as jurors, should think it proper to adopt.

The mere inability of Ward, the witness, to identify the prisoner with the man he dealt with at the counter of his bank, which was the precise objection taken to it by the defendants' counsel, was no ground for excluding his evidence entirely from the jury. Kinney supplied this lack of evidence, and he is an unobjectional witness, though his credit was impaired by his avowed participation in the crime committed.

The same may be said of the testimony of Sanford and Bosworth. Their testimony was admissible, both as testimony in chief and as confirmatory of what Kinney had testified, and was rightly admitted. Nor do we see any error in the court's ordering the box to be delivered to the jury.

We do not advise a new trial.

In this opinion the other judges concurred.

New trial not advised.