## Williams v. Commonwealth

(Decided Nov. 9, 1934.)

W. E. ROGERS, JR., for appellant.

BAILEY P. WOOTTON, Attorney General, and DAVID C. WALLS, Assistant Attorney General, for Commonwealth.

OPINION OF THE COURT BY JUDGE PERRY—Affirming.

The appellant, Charlie Williams (alias "Slim"), was jointly indicted with Bailey Warfield by the grand jury of the Christian circuit court at its February term, 1934, for the willful murder of G. E. Lane "by shooting and wounding him with a pistol, loaded with leaden bullets, from which shooting and wounding the said Lane did then and there presently die."

Williams was upon his separate trial found guilty as charged and sentenced to death.

It may be conceded that appellant's conviction upon the murder charge rested largely upon the testimony of the self-confessed accomplice, Bailey Warfield, and whether there was any or sufficient proof corroborating that testimony and tending to connect the accused with the commission of the offense is presented upon this appeal as the sole question involved and earnestly insisted upon for reversal of the judgment. Such being the nature of appellant's contention, it is necessary that we should, for the proper determination of this question, first give a brief summary of the facts as disclosed by this accomplice and corroborative evidence.

On the night of December 16, 1933, G. E. Lane, then an employee of the Illinois Central Railroad Company, was found at about 10:30 p. m. by Herman King, a police officer of the city of Hopkinsville, shot and mortally wounded, lying on the front porch of the residence of the Hon. S. Y. Trimble, situated on South Virginia street, near the Illinois Central Railroad tracks and just beyond the city limits of Hopkinsville. When found, Lane told King that he was seriously wounded and to call an ambulance at once for his removal to the hospital, which was done. Lane was removed to the Jennie Stuart Hospital, where he was operated on and later died about 2:30 a. m. following. A statement was made to the officer by Lane when found as to the circumstances under which he was shot, but its not having

been made to appear that such statement was made by Lane under a realization of his impending death, it was for such reason not offered nor introduced in evidence as a dying declaration.

The facts, however, surrounding Lane's shooting and killing, as shown chiefly by the evidence of Bailey Warfield (self-confessed accomplice in Lane's murder), are briefly as follows:

The deceased, Mr. Lane, was at the time of his murder—as an employee of the said railroad company —required, among other things, to check all railroad cars which came into the Hopkinsville yard and to examine the seals, locking same. On the night of December 16, 1933, at about 9 o'clock, he left the main office of the railroad company to go about two miles down to the railroad yard, near the fairground, to check some cars there located, which were some 500 yards distant from the home of the Hon. S. Y. Trimble. There was a switch light located at this point, and a short distance beyond and down the track from this switch light was a small house or shack, in which there was installed a company telephone. Between this point and Mr. Trimble's home, there intervenes an open field, to which Allen was removed by his assailants after they had shot him and across which he crawled to get to Mr. Trimble's home.

Upon Williams' trial, Bailey Warfield testified, as a prosecuting witness and accomplice, that he and the appellant Williams first became acquainted while they were confined as prisoners in the Warren county jail in 1933; that upon their release therefrom, they became close associates and confederates and started upon a campaign of robbery, which they extensively pursued in several of the smaller towns in Western Kentucky; that in the course of such operations, they visited Hopkinsville about the 1st of December with a view to mapping out a plan of robbery there; that about the 9th of December they broke into a store at Russellville, Ky., just prior to their robbery and murder of Mr. Lane at Hopkinsville on December 16; that after their store breaking at Russellville, they went to Elizabethtown, which it appears was their headquarters; that on January 3, the appellant and Warfield (assisted by some other negroes) broke into the Penney Store at Princeton, Ky., when Warfield was caught, but Williams es-

caped after being fired at by a watchman of the store. The proof is, as given by the accomplice and also by the appellant when testifying upon his arrest and examination in the Hopkinsville police court, that appellant and Warfield were daily associated and were constantly together throughout the month of December, 1933, in conducting their campaign of robberies, as stated, and kept together while so operating every day throughout December. The appellant admits his having committed the Russellville robbery or store breaking on December 9 and later that of the Penney Store at Princeton on January 3 while operating in each instance (and perhaps in other like offenses) with the accomplice, Bailey Warfield, as was also testified by the latter.

Warfield further testified that upon their visit to Hopkinsville about December 1, 1933, they informed themselves as to the decedent Lane's employment with the Illinois Central Railroad Company, the nature of his nightly duty as such, which was to go to the distant railroad yards at the city limits for making a record of the seal numbers of the cars of incoming trains, and of the time of his pay day as such employee on the 15th of each month; that with a view to his robbery at such time they attempted to return to Hopkinsville on that date, but that they did not arrive there until about 1 or 2 o'clock on the morning of December 16, when it appears they later called up some negro women inviting them to have breakfast with them at one Ches Haynes' restaurant, who did breakfast there with them that morning; that later that night about 9 o'clock, they went by different routes to the distant railroad yard near the city limits to meet and rob the decedent, Mr. Lane; that they met, according to plan, at the switch light, from which point they together went towards the little telephone house or shack, where they expected to meet Lane; that after going a short distance they saw Lane coming with his lantern, which he regularly carried with him in doing this work, when he (Warfield) approached Lane and asked him for a match; that as they were talking, Williams came up from the rear, drew his gun on Lane, and told him that it was a holdup; that he (Warfield) took his money (some 6 or 7 dollars) and his watch and told Williams to hit him, which he did; that Lane, when knocked down, begged for his life, telling them that he had a wife and two children, and not to kill him, but that Wil-

liams nevertheless said he would shoot the "s—— of a b——"; and that he did then shoot him in the stomach, after which they picked up Lane and carried him over into the field, where he was left by them and from which place he crawled some 500 yards to Mr. Trimble's porch, as stated supra.

Upon the trial it was also testified by the commonwealth's witness Minnie Stewart that she remembered the night that Mr. Lane was killed, having heard of it the following Sunday morning, December 17; that she lived on the top of a hill, just over from the railroad station, and had at about 9 p. m. of the night of December 16th seen a man come out of the Illinois Central freight station with a lantern in his hand; that just prior to that time she had seen two colored men come up, one up the track from the Illinois Central depot and the other from around the box factory nearby; that she saw them meet under the hill at the railroad switch light; that one of the men was tall and slim and the other a rather heavy-set man; and, upon the appellant's trial, he and Warfield being directed to stand up in the courthouse, that she (the witness) might see and identify them as the two negroes previously seen upon the occasion in evidence, she said that the low, heavy man she then saw was like Warfield and the tall, slim man was like the appellant, but that she could not recognize them other than in respect to their relative size and build, which she stated corresponded with that of the two negroes she had then seen; that after seeing the negroes meet at the switch light, they had gone on down the railroad tracks towards the water tank, which is in the direction of the little telephone shack, near where it is in evidence Mr. Lane was at such time shot and killed by them. It was about 9:30 p. m. witness stated when she saw them meet at the switch and go down the track, which by the evidence it is shown was about the time Mr. Lane was killed.

Tom Parrish, another prosecuting witness and an employee of the railroad company, testified that he was at the main Illinois Central Railroad station in Hopkinsville at about 9 o'clock, upon this occasion when he saw Mr. Lane leave there, carrying his lantern, to go out to the railroad yards for the check-up of the trains.

Goldie Bryson and Lena Weavers two colored women, were also called as prosecuting witnesses. The

former testified that she was invited by Slim Williams, the appellant, when he was in Hopkinsville, just a little while before Christmas, to have breakfast with him and Warfield at Ches Haynes' restaurant and was told by him to also call her friend Lena Weavers and ask her to join them there, and that they did that morning have breakfast with him and Warfield at Haynes'. While she first stated that the time of this occasion was just a short while before Christmas, she later, upon cross-examination, said she didn't know just what month it was in, but that it was then cool. Lena Weavers testified that she and Goldie Bryson had taken breakfast with Slim Williams at Haynes' place upon the occasion in evidence, but was unable to fix the time when they had done so.

Judge Owen Keller, police judge of the city of Hopkinsville, testified that he remembered the occasion when the appellant was in the police court upon examination before him, when he had testified as to a list of crimes committed by himself and Warfield, including the "break-ins" at Russellville and Princeton; that he had then stated that he and Warfield had broken into the stores at Russellville and Princeton, and further that he and Warfield were continuously together during every day of the month of December, 1933; and that he had been in Hopkinsville before about the last of August, but denied having been there at any time in December, 1933.

William Clark testified that he saw the appellant in the police court on the occasion of his arrest in Hopkinsville and had heard him there testify that he was not in Hopkinsville during December or within three or four months before, because he was with Warfield constantly during December, and that neither of them were during that month in Hopkinsville, though he had been there in the early summer.

O. E. Harris, a policeman of Hopkinsville, stated that he saw the appellant Williams in Hopkinsville on the 5th or 6th of December, 1933, standing on the curb in front of Ches Haynes' place; that he then asked him his name, which he gave as Charlie Williams, and when he asked him what he was doing in Hopkinsville, he answered that he was "just a road man" and that he was going out of town, when he (Harris) told him he had better catch the first train out, which Williams said he would do.

Frank Ginina, a night watchman of Princeton, Ky., also testified that on the night of January 3, 1934, Warfield with Williams and others broke into the Penney Store, when the night watchman shot at Williams as he ran away behind the store; that he (the policeman) did not at that time see Williams, but that Warfield was found hiding under a house, where he was caught and arrested.

Judge Keller upon being recalled further testified that Williams, upon his examination in the police court, had stated that he was with Warfield and some others when they broke into the Penney store at Princeton on January 3d, and that he was there shot at several times when in running away he had fallen over a cliff.

The foregoing statement of facts substantially covers the evidence introduced by the commonwealth in corroboration of the testimony of Warfield, an accomplice, against him. Upon the conclusion of this evidence, the accused moved for a peremptory instruction, which was refused. Appellant electing not to then introduce any evidence in his own behalf, the jury was properly instructed in part by an instruction given in the very language of section 241, Criminal Code of Practice, providing that "a conviction can not be had upon the testimony of an accomplice, unless corroborated by other evidence tending to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely show that the offense was committed, and the circumstances thereof." By section 242 of the Criminal Code of Practice it is further provided that:

"In all cases where, by law, two witnesses, or one witness with corroborating circumstances, are requisite, to warrant a conviction, if the requisition be not fulfilled, the court shall instruct the jury to render a verdict of acquittal, by which instruction they are bound."

From this it follows that if the corroborating evidence hereinabove set out did not fulfill the requisition of section 241 of the Criminal Code of Practice, the appellant was entitled to receive the requested instruction for an acquittal. But, on the other hand, if there was introduced such other evidence which the jury might find corroborated the accomplice testimony in that *it tended to connect* appellant with the commission of the charged offense, the requisition was fulfilled and the

trial court was warranted in giving the instruction complained of, and in refusing to instruct the jury to acquit, as requested.

From the jury's verdict and judgment thereon, found upon the above evidence, the appellant, by counsel, most ably contends that he is entitled to a reversal upon the one ground of error assigned and here argued and insisted upon most impressively, that the appellant has here been convicted on the strength of the testimony of an accomplice alone and that, when it is stricken from the record, there remains not a line of proof tending to connect him with the commission of the offense for which convicted.

For a proper consideration of this one contention, so forcefully presented, it is necessary for us to determine what is the scope and intendment of the rule of law declared by section 241, Criminal Code of Practice, requiring such corroboration of the testimony of an accomplice—that is, whether the "other evidence" required for its corroboration must, within the meaning of the code provision supra, be in itself sufficient, independently and exclusively of the accomplice testimony, to establish the defendant's connection with the commission of the crime, as is earnestly insisted by appellant.

It would appear that a proper understanding and clear appreciation of what should be held to be the degree and extent of the corroboration of the testimony of an accomplice required of the "other evidence," as necessary to convict, can be best gained from a brief consideration of the common-law background of this Code requirement. A very satisfactory and learned discussion and review of this chapter in the common-law history of such evidence, giving the background and origin of this present Code provision, may be found in Professor Wigmore's scholarly work on evidence in volume 3, pp. 2743 to 2754, wherein it is in substance stated that the question as to whether a jury may lawfully convict one of a crime on the sole testimony of an accomplice in committing the alleged crime or whether his single testimony must be corroborated by other evidence never became a mooted one until near the end of the 1700's; that until along about then, the struggle had centered around the right to admit the testimony of accomplices, who from the time of Henry VIII ap-

peared as the chief dependent of the crown in its political prosecutions; that the original controversy was over their admission as witnesses rather than as to the sufficiency of their testimony when admitted, the quantitative conception of an oath then tending to keep this question in the background, the notion being that an oath had a certain dead weight of its own, making that of one as good as that of another. As time went on, however, the modern conception of testimony began to develop and the possibility of admitting a witness and yet discriminating as to the qualitative sufficiency of his testimany became more apparent and opened the door for the consideration of this question as to its need of corroboration. About the end of the 1700's or of that century, we find the courts suggesting the advisability of discriminating against such testimony and observing the general practice of discouraging a conviction founded solely upon the evidence of an uncorroborated accomplice. This practice, however, was in England never founded upon a rule of law. The judge's instruction upon this point was a mere exercise of his common-law function of advising the jury upon the weight of the evidence, and was not a statement of a rule of law binding upon the jury. In 1775, in R. v. Rudd, 1 Cowp. 331, 336 (Mansfield, L. C. J.), the court, after referring to the competency of accomplices as "approvers," said:

> "Though under this practice they are clearly competent witnesses, their single testimony alone is seldom of sufficient weight to convict the offenders."

And again was it said in 1848 by Justice Maule, in R. v. Mullins, 3 Cox Cr. 526, that:

> "The truth of the matter is, there is no rule of law at all that an accomplice cannot be believed unless he is confirmed. It is an observation addressed, not to the Court to exclude the evidence, but addressed to the jury who have to weigh the evidence, and it is for them to say whether the confirmation will satisfy them or whether they will be satisfied without any."

Also, in the United States this same discrimination against the evidence of an accomplice was very early accepted, the judge directing that it should be corroborated. Chief Justice Ruffin in 1837 in State v. Hardin, 19 N. C. (2 Dev. & B.) 407, thus stated this cau-

tionary practice exercised by the court in advising the jury as to the evidence of an accomplice:

> "The evidence of an accomplice is undoubtedly competent, and may be acted on by the jury, as a warrant to convict, although entirely unsupported. It is, however, dangerous to act exclusively on such evidence, and therefore the Court may properly caution the jury, and point out the grounds for requiring evidence confirmatory of some substantial part of it. But the Court can do nothing more; and if the jury really yield faith to it, it is not only legal, but obligatory on their consciences, to found their verdict upon it."

Again in Commonwealth v. Wilson, 152 Mass. 12, 25 N. E. 16, 17, the court said:

> "It is not error in law for the presiding justice to refuse advising the jury that they ought not generally to convict on the uncorroborated testimony of an accomplice, it is not error in law for him also to refuse to define what is corroborative evidence within the meaning of the rule when he refuses to follow the rule. The incidents of the rule fall with the rule itself. In Commonwealth v. Holmes, 127 Mass. 424 [34 Am. Rep. 391], an attempt was made to follow the rule, and the court erred in admitting as corroborative evidence testimony which was not corroborative. If the rule of practice is one which a court ought generally to follow, still, not being a rule of law, it is a matter of discretion in any particular case whether the court will follow it or not."

Also in State v. Carey, 76 Conn. 342, 56 A. 632, 635, the court said:

> "The conditions of character and interest most inconsistent with a credible witness very frequently, but not always, attend an accomplice when he testifies. When those conditions exist, it is the duty of the judge to specially caution the jury, and, as we said in State v. Stebbins, 29 Conn. 463, 79 Am. Dec. 223, it may be possible that a failure of duty in this respect may be so marked, and may so clearly and injuriously deprive the accused of that judicial control over a trial by jury, to which he is entitled, as to furnish ground for a new trial."

Also see State v. Lyons, 70 N. J. Law, 635, 58 A. 398.

After a most comprehensive discussion of authorities from nearly all the jurisdictions in this country, declaring the court's observance of such cautionary rule of practice discriminating against the uncorroborated testimony of an accomplice, the learned author continues, saying:

"As a matter of common law, then, the doctrine was universally understood [except by one or two Courts] as amounting to no rule of evidence, but merely to a counsel of caution given by the judge to the jury."

It was rather a rule of practice than a rule of law, from which it followed that:

"The jury might or might not regard the caution by acquitting upon an uncorroborated accomplice's testimony; that they alone were to determine whether corroboration existed and was sufficient. * * * But in nearly half of the jurisdictions in our own country a statute has expressly turned this cautionary practice into a rule of law [see Ky. Cr. Code Prac. 1895, sec. 241]. The judge must therefore under these statutes instruct the jury in the rule of law, and the jury must follow it; moreover, the judge administers the rule of law [so far as this is practicable] by defining for the jury the precise conditions of its application. The binding rule of evidence thus created differs little from the terms of the common-law practice; the statute merely makes a rule of law out of a rule of practice which before had no standing except in actual usage. * * * Moreover, under such statutory rule the existence of corroborating circumstances becomes a question of law, upon which a verdict of guilty may be set aside.

"The manner in which this change came about is not difficult to perceive. At common law the judge was entitled and bound to assist the jury, before their retirement, with an expression of his opinion [in no way binding them to follow it] upon the weight of the evidence. * * * But in this country the orthodox function of the judge to assist the jury on matters of fact was * * * eradicated from our system. The judge was forbidden to contribute to the jury's aid any expression of opinion upon the weight of evidence in a given case. Unless

there was a rule of the law of evidence upon the subject of an accomplice's testimony, he could not in a given case advise them to refuse to convict upon the uncorroborated testimony of an accomplice. The makers of this innovation upon established trial-methods were thus obliged to turn into a rule of law the old practice as to the testimony of accomplices, if they wished to retain its benefits at all. This they therefore did. * * *

"The reasons which have led to this distrust of an accomplice's testimony are not far to seek. He may expect to save himself from punishment by procuring the conviction of others. It is true that he is also charging himself. * * * But he can escape the consequences of this acknowledgment, if the prosecuting authorities choose to release him provided he secures the conviction of his partner in crime. * * * It is true that this promise of immunity is usually denied, and may not exist; but its existence is always expected. The essential element, however, it must be remembered, is this supposed promise or expectation of conditional immunity. If that is lacking, the whole basis of distrust fails."

This discriminatory rule of cautionary practice against the uncorroborated evidence of an accomplice has thus for the reasons given in this jurisdiction been converted into a rule of law by the provisions of section 241, Criminal Code of Practice, and under the provisions of section 242 of the Criminal Code of Practice the court was required to instruct the jury to acquit where the required corroboration by other evidence "is not fulfilled." This discriminatory rule against accomplice testimony having thus been borrowed from the common-law rule of judicial practice, its statutory expression as a rule of law should be interpreted and construed in the light of the reasons and limitations surrounding its common-law existence as only a cautionary practice rather than to extend by alien construction the meaning and requirement of this Code provision beyond what its terms reasonably represent and prescribe when interpreted and understood in the light of its common-law background.

The wording of the Code provision, section 241, is that:

"A conviction can not be had upon the testimony of an accomplice, unless corroborated by other evi-

dence tending to connect the defendant with the commission of the offense.''

It is to be noted that the requirement here made is that the corroboration of such accomplice testimony required is merely that it should ''tend to connect the defendant with the commission of the offense''; not that it should, as intimated or even perhaps declared by the language of some of our later opinions, extend to every fact necessary to establish the fact that the offense charged was committed and that the prisoner was the perpetrator or, as announced in others, that the test of the sufficiency of the corroborating evidence is to first eliminate the evidence of the accomplice, and then, if upon the examination of all the other evidence it is sufficient to connect defendant with the commission of the offense or to establish his guilt as the perpetrator thereof, there is sufficient corroboration.

The language of these opinions in thus calling for corroboration by other evidence of such a high degree of self-sufficiency to establish the defendant's commission of the offense thus appears to rather transcend the common-law requirements of what was merely a cautionary practice rule, which has by section 241, Cr. Code Prac., and like statutes, been only converted into a rule of law for the purpose of preserving its protective policy of the accused against the danger of unconfirmed accomplice testimony, which the jury, after receiving such judicial caution as to its credibility, remained unfettered thereby and free to itself determine the issue of the defendant's connection with the crime upon its own evaluation of the weight and credibility of the accomplice testimony before it.

The alleged rule as to this contended for by appellant he claims is announced in certain of our later cases, which are cited and relied upon by him. It appears they tend to lend some support to his claim, that they go to the extreme extent of tending to nullify or entirely eliminate the testimony of the accomplice, as having no evidential value bearing upon the issue of the defendant's commission of the offense, which must be established, independently of it, entirely by such corroborative evidence. The cited Code provision, however, by its language clearly manifests that the legislative intent as therein expressed is to preserve the accomplice testimony as evidence of the defendant's

guilt, but that it should not be accepted by the jury as in itself sufficient for conviction unless confirmed by other corroborative evidence. The Code requirement is only that the accomplice testimony shall be corroborated by other evidence tending to connect the accused with the commission of the offense, which falls far short, when reasonably interpreted according to the natural meaning and import of its words and also in harmony with its common-law origin, of requiring that such corroborating evidence called for is such as must be in itself, when considered as separate and distinct from the accomplice testimony or with that eliminated, sufficient to establish the guilty connection of the accused with the perpetration of the crime. That class of our opinions, some of which are cited and relied on by appellant as supporting such an extreme requirement and one so foreign to the quoted early practice rule, which section 241 was meant to innovate into our law, as to the self-sufficiency of the corroborative evidence alone to establish defendant's guilt, should be taken as limiting the scope and intendment of the rule announced to the facts found in these cases wherein such pronouncements were made and addressed as applicable to them. Where after such limitation is imposed and the language of the opinions so criticized yet remains susceptible of the construction contended for by appellant, that the corroborative evidence must in itself be sufficient to establish the accused's commission of the offense, independently or exclusively of the accomplice testimony, we are of the opinion it goes too far and extends beyond the reason and object intended to be realized in the enactment of this Code provision in that such rule would require, not a corroboration of the accomplice testimony, but its utter elimination as evidence tending to show defendant's connection with the crime. We are thus led to conclude that such a construction of the Code provision is unwarranted, either by its language or the common-law history of this law, and therefore are led rather to adopt, as the more reasonable and better sustained construction of this section, that given and announced in the case of Murray v. Commonwealth, 28 S. W. 480, 481, 16 Ky. Law Rep. 389, where, in an opinion written by Judge Hazelrigg, the accused was held guilty in a prosecution for burglary, upon corroborating evidence that defendant was seen the morning after the burglary with his accomplice; that a week before the burglary they applied to the place burglarized

for work; that just prior to the burglary they were seen in earnest conversation; and that defendant's father-in-law, by whom an alibi was attempted to be proven, stated, when told of the burglary, that defendant might have been there. There the court said, after so summarizing the evidence and quoting section 241, Criminal Code of Practice that:

"We cannot say these circumstances do not so tend. It is probable that the sufficiency of this corroborating proof would not have been questioned but for the unsatisfactory testimony of the accomplice, Asa Murray. * * * The jury, however, heard the whole case, and under proper instructions believed beyond a reasonable doubt that the accused was guilty. We cannot interfere with this finding."

We are of the opinion that a proper statement of this rule was again announced in the case of Mann v. Commonwealth, 79 S. W. 230, 231, 25 Ky. Law Rep. 1964, wherein upon a trial under an indictment charging Mann with felonious shooting and wounding it was held that his conviction based on the testimony of an accomplice would be sustained if there was *any evidence* tending to corroborate the same; the court therein saying:

"We will assume that Saunders was an accomplice, and hold that, if his testimony had not been corroborated, it would have been proper for the court to have directed an acquittal. Miller and Smith v. Commonwealth, 78 Ky. 15, 39 Am. Rep. 194; Craft v. Commonwealth, 80 Ky. 349; Commonwealth v. Parker, 108 Ky. 673, 57 S. W. 484 [22 Ky. Law Rep. 368]. If there is any evidence tending to corroborate an accomplice, it is sufficient to support a verdict. The evidence tends to support Saunders' testimony as to the circumstances attending the entrance into the house and the shooting and wounding of Farrow."

The evidence corroborating the testimony of the accomplice in these cases was only circumstantial and much like that found in the instant case, where the testimony of the accomplice, Warfield, setting out the fact and manner of the appellant Williams' and his robbery and murder of G. E. Lane in the Illinois Central Railroad yards on Saturday night, December 16, 1933, is corroborated by the evidence of other witnesses tending to show appellant's connection with the commission

of this crime. It tends, as hereinabove summarized, to show that appellant was in the city of Hopkinsville with his accomplice, Warfield, on that date and that he was near the scene of the killing at the time it occurred, as testified by Warfield, in that two negroes looking like them were seen near and going to the place at about the time Mr. Lane was shot, attacked, and killed. Also such testimony is corroborated by other proof tending to show that the appellant was in Hopkinsville about the 1st of December, 1933, with the said Warfield, laying plans for their later robbery of Lane. Also, it is admitted by the appellant himself that he and the accomplice, Warfield, were constantly together every day, throughout the month of December, 1933, operating as confederates in carrying out their scheme of store breaking, robberies, etc., as testified by the accomplice, Warfield. It is also stated by both of them that they broke into a store in Russellville on December 9 and also robbed the Penney store in Princeton on January 3, when Warfield was arrested, and appellant escaped after being fired upon by the night watchman as stated by him. It would hardly be contended that this corroborative evidence, if the testimony of the accomplice, confessing and detailing the commission of the charged crime by himself and appellant were eliminated, would in itself be sufficient to establish appellant's perpetration or connection with the commission of the offense; but we are yet of the opinion that when it is considered in connection with such accomplice testimony, it constitutes some evidence tending to corroborate the accomplice, and therefore is sufficient to support the verdict, as was held in the Murray and Mann Cases supra, since it tended (as by the Code provision required) to connect appellant with the commission of the offense.

We feel that it is timely to here remark that, although appellant has received the extreme sentence of death as the supreme penalty exacted by the law for his adjudged wanton and brutal murder of Mr. Lane, he has yet from our study of the whole record, which we have very carefully considered, had his guilt of foul murder determined by a fair and impartial trial, in which he has received from his attorney, the Hon. W. E. Rogers, appointed by the court, a most loyal and skillful representation and defense throughout both his trial and in here presenting his appeal.

Perceiving no errors committed upon the trial prejudicial of appellant's substantial rights, we are constrained to conclude that the judgment appealed from should be, and it is, affirmed.

Whole court sitting.