## Daggit v. Commonwealth.

February 27, 1951.

John B. Rodes, Judge.

Paul R. Huddleston, Charles Huddleston and M. Earl Huddleston for appellant.

A. E. Funk, Attorney General, and W. Owen Keller, Assistant Attorney General, for appellee.

VAN SANT, COMMISSIONER—Reversing.

Under an indictment charging him with the crime of being an accessory before the fact to the willful murder (committed by Edward Kilgore) of Doctor C. B. Martin, appellant was convicted of manslaughter and sentenced to serve 11 years in the Kentucky State Reformatory. Appellant seeks reversal of the judgment on the grounds (1) the verdict was not sustained by sufficient evidence, (2) the instructions were erroneous and prejudicial, and (3) the verdict was the product of the prejudice of the jury.

The principal question for our determination is whether there was sufficient evidence to corroborate the testimony of the accomplice Kilgore. Sections 241 and 242 of the Criminal Code of Practice provide:

"Section 241. A conviction can not be had upon the testimony of an accomplice, unless corroborated by other evidence tending to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely show that the offense was committed, and the circumstances thereof.

"Section 242. In all cases where, by law, two witnesses, or one witness with corroborating circumstances, are requisite, to warrant a conviction, if the requisition be not fulfilled, the court shall instruct the jury to render a verdict of acquittal, by which instruction they are bound."

In Williams v. Commonwealth, 257 Ky. 175, 77 S.W.2d 609, 611, reference is made to the apparent conflict in previous opinions of this Court in respect to the quality of evidence necessary for the Commonwealth to produce in corroboration of an accomplice's testimony, in order to sustain a conviction. It was there pointed out that the language of the Code "other evidence tending to connect the defendant with the commission of the offense" does not require such evidence as, standing alone, would support conviction but only such evidence as, standing alone, would have the tendency expressed in the Code. In other words, the evidence need not produce every link in the chain of connection of the defendant with the crime; but, on the other hand, standing alone, it must place the defendant in pursuit of a course which indicates he is connected with the commission of the crime. We now will look to the evidence pertinent to the question.

At about 7:00 o'clock on the morning of June 30, 1948 the bodies of Doctor and Mrs. C. B. Martin were found in the front bedroom on the first floor of their home, approximately one mile from the city of Bowling Green. Doctor Martin's body was lying on the floor between the bed and the door and that of Mrs. Martin was lying on the bed. A great quantity of blood had been spilled on and near the bodies. A blood-stained ribbon was found on Doctor Martin's chest. There were particles of sand on the bed and bits of glass from a broken flashlight lens were found near the body of the Doctor. The room otherwise was not disarranged. An examination of Doctor Martin's body disclosed three pistol shot wounds in the head, a "scratch or two" were observed on the body, and there were contusions and abrasions on the head. The coroner testified that death was caused by the pistol shot wounds.

Later in the day or early in the night a Deputy Sheriff of Warren County and a member of the Police

Force of the City of Bowling Green, acting on information, went to Glasgow in Barren County in search of Edward Kilgore, whom they found seated in an automobile in front of his mother's home. They asked him to accompany them to Warren County for questioning, which he agreed to do. The officers found a flashlight with a broken lens, keys, pocket knives, a small keyhole flashlight, wire, a woman's shoulder bag, some boots, and overshoes. Part of these articles were found in the riding compartment and part in the trunk compartment of the automobile. They also found three or four cartridges in a top covering which had been removed from an old thermos bottle. The cartridges were for use in a .32 Caliber Revolver. No pistol or other firearm was found. After returning to Bowling Green, Kilgore was questioned and confessed to the commission of the crime. In his confession, he did not implicate anyone else.

Several months after the crime was committed, an inquest was held to determine the sanity or insanity of Kilgore. The jury found him to be capable of distinguishing between right and wrong, thus paving the way for the criminal prosecution. He remained in jail until his trial, at which he pleaded guilty to two indictments for murder, the one of Doctor Martin, the other of Mrs. Martin. His punishment was fixed at life imprisonment in each case. After his conviction and while in jail he made a statement implicating appellant, George Melvin Daggit. This statement was made fourteen months after the crime was committed. On Kilgore's testimony, the indictment herein was returned by the grand jury.

We will not detail all of Kilgore's testimony because of its sordid character. Suffice it to say that it was a virtual autobiography of a person whose depravity all but destroys his reliability and his integrity as a witness. It is important to note however that Kilgore's urge to kill divers and sundry persons, including Doctor and Mrs. Martin, attended in one instance by an obsession to feel the blood of his intended victim run a course over his own body, commenced many years prior to his acquaintanceship with appellant, whom he now accuses of influencing him to kill Doctor Martin, and who he contends actually participated in

the commission of the crime itself. He related his own motive for the crime to be that he was in love with a young girl from Bowling Green, who, a short time before the murder, married a son of Doctor and Mrs. Martin. Kilgore thought that his victims were responsible for alienating the affections of this young lady from him to their son. The motive he ascribed to Daggit is fantastic to say the least. He and Daggit were to kill Doctor and Mrs. Martin, whose estates then would be inherited by their son; they then planned to kill the son, whereupon the estate would pass to the son's widow; Kilgore then would marry the widow and Daggit thereafter would live with them and enjoy a life of ease. The entire testimony of Kilgore indicates that he is a person lacking in mental stability, even though he may know right from wrong. On this account, the evidence, which it is contended corroborates his testimony, must be viewed with a great deal of scrutiny.

The Commonwealth points to the shattered lens of the flashlight, to the sand on the bed, and to the bullet holes in the body of Doctor Martin and his wife as showing the crime was committed by more than one person, thus corroborating the testimony of Kilgore. We do not think that this physical evidence leads to the conclusion drawn but, if it did, or if it had been such as to show the crime was committed by a hundred men, there is nothing in this evidence to even point a finger of suspicion at Daggit.

Kilgore testified that the Martins were killed with a revolver stolen from the home of Max Nahm, Esq., of Bowling Green, with whom Daggit roomed at one time. Mr. Nahm testified that a revolver was stolen from his home, but the theft was committed four months after Daggit had moved his place of residence and six months before the crime was committed. The revolver was not produced on the trial and there is no evidence, except Kilgore's testimony, even to indicate that Mr. Nahm's revolver was used in the commission of the crime. The mere fact that a revolver was stolen from a house where Daggit formerly roomed and from which he had moved many months prior to the theft does not connect either the revolver or Daggit with the crime.

Two witnesses testified that Daggit and Kilgore

were close companions and were seen on many occasions together. This evidence does not tend to connect appellant with the crime.

Daggit himself testified that he and Kilgore spent a great deal of time together—a part of almost every day for many months—previous to the commission of the crime. That during World War II he was employed as a music therapist to treat mental patients at a hospital in Hartford, Connecticut. Daggit was a musician and he treated the patients by playing music to soothe their disturbed and distorted minds. He joined the Music Faculty of Western State College in September 1945 and retained that position until his resignation in September 1949. Kilgore was one of his students and because he had great promise in the field of music, Daggit gave him extra attention. Daggit first noticed Kilgore's "mental aberrations" during the spring of 1946. They first were manifested by a brooding nature. Kilgore's musical preferences were of the melancholy and funereal type. Daggit tried to interest him in lighter and more cheerful melodies. He testified that his student revealed an unhappy and unbalanced state of mind and often spoke of committing suicide and of the facts attending his father's suicide. He related that Kilgore was obsessed with the thought of destroying other people, especially girls who rebuffed his attentions; and, because of fancied insults or injuries, Kilgore devised fantastic plots to murder a number of persons, including Daggit's own mother and sister-in-law. Daggit worked with him to lead his mind into other lines of thought and to endeavor to restore him to a normal attitude toward life. Kilgore testified as to all these obsessions and desires, but related that Daggit and he together were plotting the crimes, although he admitted such obsessions obtained in his mind for a long time previous to meeting Daggit. Daggit testified that on the night of June 29, 1948 Kilgore came to his apartment in a "distraught" state of mind and requested Daggit to return to the studio and play for him. Daggit was very tired but reluctantly agreed and they left his apartment about 10:30 p m., driving to the Western State College music building where they noticed lights in Dr. Hart's office. Daggit refused to go in for fear it would disturb Dr. Hart, and Kilgore accepted this excuse. They then drove down town and re-

turned to Daggit's apartment where they talked a few minutes and Daggit bade Kilgore good night and entered his apartment about 11:15 or 11:30 p. m. He did not leave the apartment until 7:30 o'clock in the following morning, when he went to the college to teach an early class. The Commonwealth points to Daggit's testimony as being corroborative of Kilgore's testimony, but we think it to be diametrically opposed to it. The killing, according to the doctor who examined the body, could not have occurred before 1:00 or later than 2:30 on the morning of June 30th, and all of the evidence points more nearly to its having occurred between 2:00 and 2:30. Thus, Daggit does not place himself with Kilgore for at least an hour and one-half and more probably two and one-half hours before the crime was committed. A person who listens to insane delusions cannot be charged with participating in the fabrication of a plot to consummate the insane desire of the person to whom he is listening, nor can one who is attempting to soothe a distorted mind be suspected of agreeing with the delusions expressed by the afflicted person.

Kilgore's mother, sister, and uncle testified that after the crime was committed Daggit told them that he was with Kilgore until around midnight. This evidence does not contradict Daggit's testimony that he left Kilgore between 11:15 and 11:30, because for practical reference that is around midnight. Kilgore's mother additionally testified that Daggit stated to her "I love that boy. If anything happens to him I cannot bear it. If he is in prison, I want to be in prison too." Although other inferences reasonably could be drawn from this statement, it is not susceptible of the inference that Daggit was connected with the murder.

We are of the opinion that Kilgore's testimony is without support of any corroborative testimony, on which account appellant's motion for a directed verdict of acquittal should have been sustained. But since there may be another trial, and that we may not overlook the remote contingency that the Commonwealth may introduce sufficient evidence to submit the case to the jury, it is necessary for us to pass on the complaint made of the instructions.

The circumstances and Kilgore's confession of the homicide characterize it as murder. Therefore, appel-

lant is guilty of murder or nothing. Nevertheless, the court instructed the jury under the law of manslaughter and it was under this instruction that appellant was found guilty and sentenced to 11 years in the state reformatory. This was error and extremely prejudicial. Johnston v. Commonwealth, 170 Ky. 766, 186 S.W. 655.

The judgment is reversed.