## Penney v. Commonwealth.

Oct. 23, 1942.

William B. Martin, John A. Fulton and Charles Wylie for appellant.

Hubert Meredith, Attorney General, and W. Owen Keller, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—
Affirming.

In the early morning of Sunday, September 28, 1941, J. M. Giles, owner of a sanitarium in Fayette County, one-fourth mile from the Lexington Country Clubhouse, was aroused by the ringing of his doorbell. When he opened the door a woman clad in her night clothes fell into the hallway. Her night clothing was soaked with blood. The woman was Mrs. Elsie Miley, matron at the clubhouse, the mother of Marion Miley for whose murder appellant, Robert Anderson and Raymond Baxter were indicted, convicted and sentenced to death.

Mrs. Miley made it known that her daughter was in a precarious condition, and asked that she be given aid. She was taken to a hospital where she died within a few days without making any statements relating to the tragedy. When officers and neighbors went to the clubhouse, following the appearance of Mrs. Miley at the sanitarium, they encountered a scene of disturbance and disorder. There were indications that persons had entered the building through a door to the kitchen, and to that part of the building occupied by Mrs. Miley and daughter. The door on the steps leading to their sleeping quarters had been smashed in, and the apartment was in great disorder.

Marion Miley's body was found in the hallway between her bedroom and the mother's room; the latter was spattered with blood. The telephone had been ripped from connections; the bed was blood soaked, and there was much confusion. The episode naturally caused great excitement, and vigorous investigation by officers was at once set in motion; for a time officers were baffled, and were so until a boy who delivered papers in the neighborhood of the Club, gave them a clue by describing to them an automobile he had seen parked near the clubhouse in the early morning of the tragedy. Nothing developed from this clue until officers learned that appellant had been arrested in Fort Worth, Texas, with an automobile reported as stolen, and which tallied with the car described by Cramer, the Lexington newsboy.

Penney, in Fort Worth, admitted complicity in the crime, and implicated Anderson, and later Baxter, who were thereafter arrested. On October 27, 1941, the grand jury returned a true bill charging the three with

the murder of Marion Miley; the indictment in seven counts covered every phase of the crime of homicide, and a conspiracy.. Separate trials were had, Baxter going to trial on December 15th; Anderson on December the 12th, and Penney on December the 18th, with the result that each was found guilty and sentenced to death. Judgment was entered in accordance and each has prosecuted appeal to this court, asking reversal on grounds some of which appear to be common, but in several instances of different nature.

Due chiefly to the fact that Penney made a confession implicating his companions, we take up his case first, thus getting his version of the plans laid for, and the consummation of the crime. Penney was unable to employ counsel and the court appointed attorneys of the Lexington bar to represent him.

At the outset it was stipulated that Penney did not fire a shot or shots which struck either Mrs. Miley or her daughter. After introduction of evidence which proved the corpus delicti, details of the occurrences at the sanitarium, and a thorough description of the condition of the clubhouse, particularly by Officer Maupin of the Police Department, it was brought out that Penney had made a confession, which had been reduced to writing and read to and signed by accused. At this point, at request of counsel, a hearing was had in the Judge's chambers for the purpose of giving accused opportunity to examine the statement, and for the court to ascertain if it had been obtained in violation of our anti-sweating act.

This proceeding was short and simple; accused said that he had made the statement voluntarily, without threat or promise; that it was ''all he wanted to say about it at this time.'' The statement was introduced and read to the jury by the Commonwealth's attorney. Penney was introduced as a defense witness and we have concluded to quote from his testimony, in which he related the preparation for the robbery, culminating in robbery with deadly weapons and the homicide.

Accused, thirty-two years of age, had lived in Lexington for eighteen years. He was a carpenter and metal worker, out of employment. He had known Baxter for about four months. Some time in August, 1941, and later in September, he had asked Baxter if he knew where he might get work; Baxter at the time was working at the

Country Club, and appellant asked if there was an opening. Baxter told him there was not, but that there was a "lot of money out there to be made easy; that there was just one old woman who slept there, with three or four thousand dollars under her pillow, and there was nothing to do but go out there and pick up the money; no gun would be needed, as there was no one there but the old lady." Appellant said that he afterward talked to Tom Lunsford, and he agreed to join in the enterprise, but later declined. He corroborates Penney.

Referring to his confession and reiterating certain statements therein, he said that he had talked with some man who inquired "what he was doing," and who suggested that he go to Louisville to see Bob Anderson who might have something for him to do. Appellant knew Anderson, and had at some prior time talked with him about a place to store some whiskey. He later saw Anderson; told him of the Lexington Clubhouse proposition, and he agreed to take part. Penney and Anderson left Louisville in Anderson's car about 8:30 p. m. (27th), each driving a portion of the way. Reaching Lexington about 11 p. m., they drove out to the place where Baxter worked. They failed to find him and drove to "Ma" Gabbard's place (roadhouse) where they located him, and all three parties got in the car and talked about the proposed robbery. Baxter said there had been a good crowd that night and it was a good night to go out. The three rode around in Anderson's car; visited another roadhouse, then back into Lexington where they stopped at a drugstore and got a flashlight. (A clerk testified that some man, at about 1:30 a. m., September 28, bought a flashlight; he identified him as Anderson).

Later Baxter left the two and agreed to meet them at the Club grounds at two o'clock. When they arrived Baxter was not around, but came up about twenty minutes later. The Anderson car was parked inside the grounds, a short distance from the gate, and Baxter pulled in back of them, got out of his car and told the two to follow him; they stopper near the clubhouse and Baxter then left to take some people to the pump house, and in a short while came back, walking. (Oscar Givens testifies as to the trip with Baxter from the Club grounds to pump house, and as to Baxter's going to the Buick car and talking to some one he did not know). One of the two asked Baxter whether the telephone wires had been

cut; Baxter was supposed to have cut them, but he plead lack of opportunity. The three went around the building looking for the place where the wires came in, but could not locate them. Baxter, with his flashlight, pointed out the room where Mrs. Miley slept. He was also to have had a key to a rear door, but had failed in this respect, so, one or the other, Anderson or Baxter, removed a screen and Penney, with some assistance, got in through the window, unlocked the rear door and Anderson came in; Penney supposed that Baxter left.

The two went to a door at the top of the steps and found it locked. They heard a car and saw lights, and both left and went to the driving range to find Baxter and located him. They were to meet him at this place after they had accomplished the robbery. They told Baxter of their difficulties and he agreed to go back and "look things over again;" he came back shortly and said everything was all right and left. The two got out of the car, leaving the door open; Anderson said "wait," and went back to the car and got two guns and gave Penney an automatic pistol. They went in through the kitchen; Anderson got an "iron piece of some kind," and a screwdriver, which he gave to Penney, and Anderson wrapped the iron piece in a towel, which he used in breaking the panel of the stair door, reaching in and unlocking it. Before they entered the apartment Penney thought he heard some one call out, "Who's there?" Just after they entered the door Penney says he was knocked down; he could not tell who or what had struck him as it was dark. Some one grabbed him around the neck; in struggling to get up the pistol was fired, the "flame going toward the floor."

He says that then "everything broke loose; there was lots of shooting, scuffling, screaming and hollering," all up the hallway, from the point where he was knocked down. Penney then went up to the room at the end of the hall and saw Anderson jerking the telephone out of a woman's hands. The woman was telling Anderson that the money was in the drawer. He (Penney) went to the dresser, opened a drawer and "grabbed out two ten dollar bills and a check for five dollars." About this time a light came on from the outside, "like a car light," and Penney said to Anderson, "Let's get out of here; we left and got away as quick as we could," and drove back to Louisville.

When Penney made his first statement to the officers he refused or failed to tell correctly what had become of the pistols they had on the night of the homicide. He said that they were thrown into the river. The officer suggested that an examination would disclose whether or not the pistol handed him (Penney) had been used in killing any one. He later took the officers to the place where they were buried, in or near Shawnee Park in Louisville. They also disposed of a purse or brown bag in a storm sewer in Louisville. This had apparently contained some money, as it appears in a division Penney received $59 as his portion. After the guns were recovered, officer Maupin told Penney that if he had held the "shiney gun" it was not one which had caused either death. (This was, as indicated supra, stipulated).

It developed that Penney had been convicted once for grand larceny; again for assault with intent to rob; that he had become acquainted with Anderson while both were in the penitentiary. That previous to the plans to rob the clubhouse he had discussed with Anderson another Lexington robbery. He also said that Mrs. Miley was the woman from whom Anderson jerked the telephone as she was sitting on the side of the bed; that when he (Penney) left her room and went down the hall he stepped around the body of the other lady, but he didn't know she was shot; just thought she was knocked out. He admitted that he had blood on his coat, and two buttons were torn from his coat.

Penney learned from the papers that Marion Miley was dead and the mother was in a desperate condition. He then went up and talked to Anderson and they thought the Anderson car should be gotten rid of in some manner, and it was agreed that Penney should dispose of it, and he drove it to Fort Worth, and this car led to his arrest. Penney agreed that no promise of immunity or mercy had been made him.

The foregoing is the material substance of the testimony, omitting many details contained in the evidence and confession, reference to many exhibits showing plat of premises, broken or removed screen, the pistols, numerous photographs, etc., which may be of pertinence on one or the other appeals.

There were eight or more grounds set up in motion for a new trial, but in a well prepared and vigorous brief

counsel have insisted on only three alleged errors, which they say were substantial and worked to the prejudice of the accused, they being: (1) Prejudicial error in overruling motion for a continuance. (2) In denying a new trial, when it was developed that the members of the jury were allowed to read newspapers during the trial which contained news items about the trial, unfavorable and prejudicial to the substantial rights of the accused. (3) Error "in refusing to grant appellant a new trial on the ground of the testimony of G. W. Maupin, and his constant reference to blood and because of the testimony in evidence," which we construe to mean that the court admitted incompetent or irrelevant evidence over counsel's objections, and generally, by way of "conclusion," argument to the effect that the punishment inflicted was too severe, because Penney in making his voluntary confession had assisted officers in making investigations, incriminatory in nature, as to Anderson and Baxter, taking the position that if a new trial should be granted appellant would stand a chance of having a trial free from any bias or prejudice, arising from a general feeling of horror at the brutality of the crime, and from the effects, if any, of the two preceding trials. This appeal must be weighed by us, as it was no doubt by the trial judge, solely in the light of the proceedings as shown by the record.

Appellant's motion for continuance was based on the ground that much feeling had been engendered during the previous weeks, or days, during which Anderson and Baxter had been found guilty and sentenced to death. There does not appear in the transcript any showing that there existed at the time of Penney's trial any undue excitement or feeling against him. There was no motion for change of venue, or to have a jury summoned from another county. The jury was selected from a special venire of 200 qualified jurors, the order for the venire having been consented to by appellant.

In commenting in his written opinion in overruling the motion, the court said that the defendant had fairly testified in both the former trials, and the jury was requested on his trial to give consideration to this fact, and remarked that in view of the fact that Penney had admitted his connection with the robbery and homicide, it was difficult to perceive how there could be prejudice toward him by being tried at this time rather than some

later date, since on his trial there would be brought out facts with reference to the former trials of Penney's co-defendants, and the jury trying him could hardly be unaware of the verdict in the former cases.

We agree with the court's expressed views and in the absence of a showing of prejudice or feeling, occasioned by the fact that Anderson and Baxter had been found guilty and sentenced or otherwise, we are not justified in ruling that the court erred in overruling the motion. Counsel admitting the court has a discretion in ruling on such motions insist that there was a palpable abuse of discretion, citing us to no authority save Smith v. Com., 42 S. W. 1138, 19 Ky. Law Rep. 1073, which states the rule to be that this·court will interfere where there has been abuse of discretion. In Carsons v. Com., 243 Ky. 1, 47 S. W. (2d) 997 (citing numerous prior opinions), we held it to be a rule that sentiment or prejudice against the accused, at the time of the trial, due to his wrongful acts, did not authorize continuance until sentiment or prejudice subsides. This case is referred to in Deboe v. Com., 257 Ky. 792, 79 S. W. (2d) 236, though neither of the two presents the same situation as to recent former trials and their result, though we can see no difference, particularly in absence of showing of prejudice due to the fact.

It is argued that appellant's rights were prejudiced because the jurors had newspapers which told of the progress of the trial, making reference to the penalties meted to Anderson and Baxter. This ground was supported by affidavit of counsel, stating in substance that immediately after the jury had returned its verdict "affiants saw some papers in the jury room in which the jury had been deliberating, * * * and that at that time a deputy sheriff was standing at the entrance to the room and had the room barred to the public, and these affiants called the attention of the officer to several newspapers located in said room, and he and affiants went into the room and examined two newspapers, both of which contained the articles mentioned in defendant's grounds for a new trial."

The two papers were issues of the Cincinnati Enquirer of Thursday, December 18, 1941, the date upon which verdict was returned. The article dated at Lexington, December 17 (A. P. communication), recited that

Penney had gone to trial on that day; it spoke of the stipulation that Penney had not fired a shot, but would be proceeded against as being guilty of aiding or abetting. It quoted from the opening statement of the prosecuting officer, in which he had stated what the prosecution expected to prove. It gave the names of the jurors, and referred to the fact that Penney had made a confession, setting out briefly what it contained. In other words, the news item was what one would expect in reporting progress of a trial for a crime which had drawn more than the ordinary general public interest. The portion which is subjected to complaint is that which recited the fact that Anderson, owner of a Louisville night club, who had claimed alibi, and Baxter, who testified that he was at the time under the influence of drugs and could not remember what had happened, were convicted and sentenced to death.

Counsel admitting "that the reading of a newspaper by a juror," during the progress of the trial is not sufficient grounds for setting aside the verdict, unless the defendant is prejudiced thereby, insist that this court should conclude that the reading of the papers was prejudicial. The court in his opinion in commenting on this ground, remarked that the affidavit was insufficient since it did not state, nor was there affirmative testimony showing that any one of the jurors had read the article, and further that the Commonwealth had filed the affidavits of all jurors to the effect that they had not read it, one juror admitting that he read the headlines. The headlines read: "Thomas O. Penney placed on trial for life as third participant in Miley slaying," this in bold-faced type. The court could not see "how the jury was to be prejudiced by the article when they did not read it," and we agree. The reference to the verdicts in the Anderson-Baxter cases contained in the news article was not news to the jury, because in the examination of Penney it was developed that both had been tried, found guilty and received death sentences.

Counsel lay great stress on the fact that the jurors were permitted (in error) to say they had not read the newspapers, and cite Section 272 of the Criminal Code of Practice, and annotated cases, construing and giving application to the section which prohibits the examination of a juror "to establish a ground for a new trial," except it be for the purpose of showing that the verdict

was reached by lot. The jurors here were not examined to impeach the verdict. The distinction may be noted by reference to Bowling v. Com., 285 Ky. 133, 147 S. W. (2d) 73.

The final contention is that the jury was biased or inflamed to some extent, because Maupin, the officer who made the investigation, had made frequent references to "blood" and the "bloody condition" found in the Miley apartment; that the Commonwealth's attorney in argument had said that the appellant "had blood on his hands," and by the introduction of blood stained garments. It was a bloody affair. An examination of the body of Marion Miley developed that one bullet had entered the top of her head on the right, passing out the left cheek below the ear; another entered her back near the spine, coming out over the left breast. There was a bruise on the bridge of her nose, another on the left knee. The bloody condition of Mrs. Miley's garments when she appeared at the sanitarium door was described by the owner without objection. Maupin's description of the scene at the apartment, from observations made at 6:40 a. m., following the homicide, and his identification of articles in exhibit on trial, were in minute detail. There were references to "blood" and "pools of blood," though it is not claimed that Maupin made any misstatements in his descrpition, or exaggerated the scene which he found. His description, as far as the record shows, was accurate, and the photographs showing the conditions, particularly of Mrs. Miley's room, do not belie the oral testimony.

It can hardly be conceived that the Maupin testimony had any more damaging effect on the jury than Penney's testimony, when he says "Everything then broke loose; there was shooting, scuffling, screaming and hollering." We need not pursue the discussion further, since we fail to find by reference to the record that timely objections were made to the testimony relating to the situation, except to the introduction of pictures or other exhibits. We do note that counsel says that the court sua sponte suggested to Maupin not to make too many references to blood. We also note that the court did not allow a description of Mrs. Miley's body, which, as depicted in this and another of the cases, showed a bloody condition.

We have observed the only case cited by counsel which tends to hold error where bloody garments were "flaunted before the jury," which in no way tended to connect the defendant with the homicide, but as the court found, displayed with the sole purpose of inflaming the minds of the jurors. McKay v. State, 90 Neb. 63, 132 N. W. 741, 39 L. R. A., N. S., 714, Ann. Cas. 1913B, 1034. Counsel overlooks the fact that in this case the appellant was convicted under correct instructions on the charge of aiding and abetting in the murder of Miss Miley, and as such was a principal under our statute.

It was, therefore, competent to show facts which could not but help illustrate the enormity of the crime. The tragedy and its story was written in terms of blood, in describing which, softer words could not well have been employed. The situation existing was brought about by the acts of appellant; he was responsible for the conditions found.

The alleged statement of the prosecuting attorney was a figure of speech. It may be that appellant did not have blood on his hands, but there was blood on his clothing and shoes, due as he said to his presence in the Miley apartment. The court in his opinion indicates that there was no objection in this respect. Inspection of the record verifies this statement.

Taken as a whole, it is not, nor could it be argued that the verdict was contrary to the evidence. The tenor is, that due to the fact that appellant confessed, and (admittedly) assisted the Commonwealth in solving the crime, the jury should not have inflicted the severer punishment. Were we to agree with this conclusion, it would not permit us to reverse the judgment. The appellant by his admitted acts brought himself into the predicament.

A survey of the record manifests no error which would authorize the granting of a new trial. His trial was fair; the issue was submitted to a jury under instructions which are not subjected to complaint. The Commonwealth fairly agreed that Penney did not fire a shot, though he was armed. The jury, the final arbiters, no doubt considered this fact and his aid, but under the proof could not see their way clear to extend mercy to one who, with Baxter, initiated, and with his other co-

defendant, consummated a crime which did not call for amelioration.

Judgment affirmed. The whole court sitting.