## Sumner v. Commonwealth.

(Decided Nov. 2, 1934.)

NAPIER & EBLEN for appellant.

BAILEY P. WOOTTON, Attorney General, and DAVID C. WALLS, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

The Kentucky River Coal Corporation owned a number of equipped coal mining operations, located in Letcher county, one of which was the Rockhouse mine. It and its equipment were leased for operating purposes to another who as such lessee mined coal therefrom until July 20, 1929, when it was closed through bankruptcy proceedings against the lessee. It remained closed and not operated for some years thereafter, but in the meantime, and in the spring of 1930, its entrance

was boarded up and the doors thereto fastened in prospect of an indefinite shutdown. A part of the equipment was a large copper trolley wire, or "Booster cable," used in furnishing and conducting electricity for power purposes, and there was also smaller copper wire used for light or other purposes. About the time or just after the entrance to the mine was inclosed in the manner described, the lessor and owner, Kentucky River Coal Corporation, discovered that almost its entire cable wire and a large portion of its smaller one had disappeared from the mine, in which there was convincing indications that it had been cut to pieces and carried away in bundles or packages with felonious intentions and purposes. During that time, and preceding and following it, the defendants in the indictment here involved, John White Sumner and his two sons, the appellant Willie Sumner and Dennis Sumner, lived on a farm adjoining the mineral estate of the Kentucky River Coal Corporation whereon was located the Rockhouse mine, the line separating the two estates being within one-quarter of a mile from the mouth of the mine. The three Sumners were later indicted by the grand jury of Letcher county, and accused of stealing the missing wire, which was of value more than $20, and at the separate trial of appellant Willie Sumner he was convicted and punished by confinement in the penitentiary for two years. His motion for a new trial was overruled, and from the judgment pronounced upon the verdict he prosecutes this appeal. The grounds for a reversal argued in briefs are: (1) Error of the court in refusing the peremptory instruction of acquittal offered by defendant; (2) insufficient evidence to sustain the verdict; (3) error in the admission and rejection of testimony, and (4) error in the instructions, and failing to instruct upon the whole law of the case. In disposing of them in the order named, we will discuss grounds 1 and 2 together, since they each relate to the evidence heard on the trial.

1, 2. On May 3, 1930, Speyer & Co., junk dealers in Lexington, Ky., received a telegram from Dennis Sumner, inquiring if they could handle a shipment of copper, and also saying: "I will have same delivered to you by agent there immediately." The wire was shipped in the name of Dennis Sumner, but in the meantime the officers of the Kentucky River Coal Corporation, pursuant to arrangements previously made, were notified,

and, when the shipment arrived in Lexington, it took the property from the carrier under a claim and delivery writ. The Sumners intervened in that action, and claimed the ownership of the property, but on trial the court adjudged the coal corporation to be the owner. On that as well as on this trial appellant and his co-defendants in the indictment testified that they did not get the wire from the mine of the owner, but that "about June 10, 1929," they found the 1,200 pounds of copper wire that was shipped to Lexington on the farm upon which they resided, and which was "laying and kindly in a drift of something in burlap sacks, or sacks whatever you call them," and that it had been previously cut in pieces about a foot in length, each piece weighing about one pound. Appellant stated that he and his father and one Cisco Sargent, a nephew of the father, and who had been reared by him as a member of his family, while repairing a farm fence, made the discovery of the presence of the wire, and which was near to or within a small drain, and it was partially covered with drift or debris. They suffered it to remain in that place for quite a while, but eventually moved and deposited it in a lot near the residence, some 100 feet or more from the road, where it again remained until a short while before it was prepared for shipment. The railroad agent at Blackey, a nearby station, and from which the shipment was made, testified that it was delivered to him on April 23, 1930, packed in four boxes of about 300 pounds each; the number of alleged sacks in which the wire was alleged to have been found was some 6 or 8 and weighed about 200 pounds each.

Neither of the three defendants in the indictment testified to having made any inquiry of any one in that neighborhood or elsewhere as to the ownership of the wire, nor did they make any investigation to ascertain how it became deposited at the place where they claimed to have found it. Officers and agents of the coal corporation positively identified the cable wire, which was the larger portion of the shipment, as being that which had been taken from the mine. It was one inch in diameter, and consisted of 19 strands twisted together. They were enabled to identify it because of several facts stated by them relating to its peculiar manufacture and its indicative marks, and also because it was the only wire of that thickness in the entire surroundings; none other being larger than three-fourths of an inch in

diameter. Appellant admitted his participation in the alleged discovery of the wire, its movement from that place to the lot near his father's residence, its preparation for shipment and carrying it to the depot. He also appeared as a witness in the Lexington civil action referred to, and he insists on his equal claim of ownership of the wire by finding it deposited on his father's farm in the manner indicated.

In addition to that testimony, Cisco Sargent at this trial testified for the commonwealth, and in which he confessed that he and the three defendants in the indictment took the wire from the mine of the coal corporation and deposited it at the place of the alleged finding. He also confessed participation in the movements of the wire from that time until it was shipped. However, he had previously testified on two occasions (in the civil suit in Lexington and at the examining trial of the accused) that he knew nothing about the wire until it was found on the Sumner farm, and denied that it had been stolen from the mine as he testified to at this trial. He gave as a reason for changing his testimony that he was conscious of the fact that he had at first falsified and that he wanted to relieve his conscience by telling the truth. The record discloses no sort of ill will between him and any member of the Sumner family, but that, on the contrary, there existed between them the best of feelings. However, there is an effort made to show that Sargent was in some manner rewarded for changing his testimony, but which is denied by him and all others connected therewith. But, after all, the credence to be given his testimony was one to be weighed by the jury in the light of the facts.

Notwithstanding the record pictures the case as we have so briefly outlined it, it is strenuously contended (a) that there was no corroboration of the testimony of the accomplice, Sargent, and, under the provisions of section 241 of the Criminal Code of Practice, defendant's motion for a peremptory instruction of acquittal should have been sustained, but, if mistaken in that, then (b) the testimony as a whole was insufficient to sustain the verdict, and it was and is flagrantly against the evidence. But we are wholly unprepared to accept either contention. In the first place, the alleged finding of the wire on the Sumner farm and the way and manner it was thereafter handled, plus the secrecy of the

fact of the finding, makes, to say the least of it, an exceedingly hazy explanation of possession. But there is one undisputed fact in connection therewith which tends largely to establish its falsity, and which is, that the defendant and his witnesses are positive that the alleged finding was somewhere between the 10th and 15th of June, 1929, when the mine from which the wire was taken was not closed, nor had it ceased to be operated with that same wire, until more than a month thereafter. Furthermore, it needs no citation of cases or text authorities in support of the proposition that possession of stolen goods is presumptive evidence of the theft, and casts the burden on accused to satisfactorily explain his possession consistent with his innocence. It was for the jury to determine whether that had been done in this case, and which they found in the negative, and our conclusion is that they were fully justified in doing so. The record discloses other facts and cricumstances strongly pointing to appellant's guilt, and a more elaborate analysis of the testimony would more thoroughly establish the fallacy of the defense, but we do not deem it necessary to do so. That conclusion also disposes of the contention that the testimony of the accomplice witness was not corroborated in the manner required by the Code section. We therefore conclude that neither ground 1 nor 2 contain merit.

3. The only reference to ground 3 in brief of counsel is found on page 5 thereof, and it in its entirety is: "We shall not attempt in this short brief to point out the many errors of the lower court on the trial of this case in admitting incompetent evidence and submit the whole of this record to this honorable court for opinion in respect to the court's error in admitting incompetent evidence as well as the errors of the court in rejecting competent evidence offered by the appellant in the lower court." We had occasion to deal with a similar method of presenting errors to this court in the case of McCorkle v. Chapman, 181 Ky. 607, 205 S. W. 682, wherein counsel had declined to point out the numerous alleged errors which he claimed the record contained, and contented himself with requesting the court to search the record for any that might operate detrimentally and prejudicially to the rights of his client. In declining to do so, we therein said: "We have in many cases announced the rule that this court has neither the time nor the inclination to search a record in order to dis-

cover errors which might justify a reversal, and, if none such is pointed out by the litigant who is complaining of the judgment, it will be presumed that no errors exist, and the judgment will be affirmed. * * * In this case we are simply handed a record of the size mentioned, and invited to search the record, and if we can find any errors authorizing a reversal counsel will be much obliged. But, from what has been said, it is our duty to decline the invitation, and the judgment is therefore affirmed.'' The same treatment will be administered here, although it might not be amiss to say that a most careful reading of the record has not disclosed any error in the particulars referred to.

4. The only alleged errors complained of in brief in support of ground 4 are, that the indictment which charged a joint larceny committed by the defendants therein as principals did not authorize an instruction to convict appellant if the stealing was actually done by his codefendants while he was present aiding and abetting; in other words, complaint is made of the aiding and abetting instruction. Whatever may have been the rule at common law, our present section 1128 of Carroll's Kentucky Statutes 1930 edition makes principals of aiders and abettors before the fact. One of our latest cases authorizing the aiding and abetting instruction, under similar circumstances of this case, is Hogan v. Commonwealth, 230 Ky. 680, 20 S. W. (2d) 710, 711. In that case the same contention was made, and we adversely disposed of it in this language: ''The argument is that both defendants were indicted as principals, and, as neither was accused of being an aider or abettor, neither could be convicted therefor. In this respect counsel is in error. Section 1128, Ky. Stats., makes accessories before the fact liable to the same punishment as principals. Construing this statute, we have held in numerous cases that in a joint indictment for a felony either of the defendants may be convicted as principal or as aider and abettor. Com. v. Lawson, 165 Ky. 4, 176 S. W. 359; Greenwell v. Com., 125 Ky. 192, 100 S. W. 852, 30 Ky. Law Rep. 1282; McGehee v. Com., 181 Ky. 425, 205 S. W. 577; Reed v. Com., 125 Ky. 126, 100 S. W. 856, 30 Ky. Law Rep. 1212; Roberson's Criminal Law (2d Ed.) sec. 186.''

It is further argued in support of this ground that the court erroneously defined the words ''feloniously''

and "aiding" and "abetting," but no case is cited in support of the criticism, and we surmise that none could be because the definitions conform to the approved ones by this court in an unbroken line of opinions. Besides, we have held in a number of cases that the word "feloniously" in a criminal prosecution need not be defined at all.

Perceiving no error prejudicial to the substantial rights of the appellant, the judgment is affirmed.