# Salyers et al. v. Commonwealth.

(Decided April 29, 1938.)

(As Modified and Extended on Denial of Rehearing June 24, 1938.)

MONTGOMERY & MONTGOMERY and C. C. BAGBY for appellants.

HUBERT MEREDITH, Attorney General, and W. OWEN KELLER, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER—Affirming.

About 8:30 a. m. Saturday, January 23, 1937, Virgil Salyers shot Milford Hogue with a shot gun, from which shooting Hogue died the following day about 11:15 p. m. Virgil Salyers, his brother, Luther Salyers, and Johnny Hamilton were charged by indictment with murder pursuant to a conspiracy, and, upon the trial of Virgil and Luther Salyers, they were convicted of manslaughter. The punishment of Virgil was fixed at 21 years, and that of Luther at two years, in the penitentiary.

### The Facts.

There had been bad feeling between Milford Hogue and the Salyers family for some years, growing out of the use by the Salyers family of a passway through Hogue's property. They had had previous difficulties and some courthouse experience growing out of these differences.

The evidence for the Commonwealth indicates that Hogue had gone out this morning to feed his sheep and had an armload of shock fodder which he was scattering along a log when he was shot by Virgil Salyers. This log is near a rail fence along this passway. This fence is on an embankment. There was a sleet on the ground that morning, and there was a place on this embankment where the sleet had been broken, and a foot print evidently made to get upon this embankment my some one who hid himself in a corner of the rail fence. This evidence indicates that some one had stood in the corner of this rail fence for some time. Weeds

and briers were tramped down, and the Commonwealth contended that it was from this point that Hogue was shot while he had a bundle of fodder, or some of it, in his arms. In his dying declaration Hogue said that Johnny Hamilton shot him, and that Luther Salyers was standing near him, and that both had shotguns. The evidence indicates that Hogue was mistaken about Johnny Hamilton doing the shooting. Virgil Salyers admits that he did the shooting, and claims that he did it in self-defense. The evidence indicates that, while Luther Salyers was present, he did not fire a shot.

According to Virgil Salyers, he was walking along the middle of the road and after Hogue had dropped his fodder, Hogue started toward him and said, "Virgil, I have told you and told you to let this road alone"; that Hogue reached his hand into the bib of his overalls and drew a revolver and said, "I am going to kill you"; and that Hogue came 10 or 20 steps towards him and that he (Virgil Salyers) shot him; that Hogue turned round when the gun fired and that he (Virgil) put another load in his gun, and Hogue said, "Virgil don't shoot me again, you have killed me."

Virgil insists that he was not in this fence corner concealed, but was in the roadway and had shot Hogue through the fence, but there was much evidence which indicates the account given by Virgil Salyers is incorrect. For example, at one place in his testimony, he says that after the shot was fired he stepped back down into the roadway. No shot were found in this rail fence at the point where Salyers claimed to have shot through it. One of the sheep was shot and died of that wound and some cornstalks were found there with blood on them and holes in them, indicating Hogue was shot while he had this fodder in his arms and while he was surrounded by the sheep. No pistol was found on or about Hogue, and Luther Salyers testified that he did not see Hogue with a pistol.

Beyond where Hogue was standing there was another rail fence, and shot was found in that fence. A string was stretched from those shots to the corner of the fence where these tracks were found and this string passed along the end of this log where Hogue said he was. The string stretched from these shots in the back fence to the place where Virgil Salyers said he was in the road did not pass near the end of this log where

Hogue claimed he was. All or this was a question for the jury, and it was submitted to it under instructions not complained of as to form; and, under such circumstances, we cannot disregard the jury's finding.

## Plea in Abatement.

There was an unverified plea filed by the attorneys for Virgil and Luther Salyers on February 11, 1937, the tenth day of the term in which it is charged that Virgil was taken before the grand jury and in the presence of the county attorney who was assisting the grand jury, and without being advised of his constitutional rights, and being ignorant thereof and without an opportunity to consult his counsel, he was required to and did answer all questions that were propounded to him, and was required to disclose to the said grand jury facts with reference to this homicide and his participation therein, and that of Luther Salyers. He says that this evidence was given under compulsion, while he was in custody of the jailer, and that his appearance and testimony before said grand jury was not voluntary on his part, but was given under compulsion, and that said procedure is in violation of his constitutional rights.

If the question involved in this contention had been timely made, and if it had been properly made within the time, there is no doubt but that the indictment should have been quashed, since it appears to be practically the universal rule—in view of constitutional guaranties—that an indictment, either partially or entirely procured upon involuntary testimony of the defendant indicted, will be quashed if application therefor is properly made. See the case of Taylor v. Commonwealth, 274 Ky. 51, — S. W. (2d) —, and other cases cited therein. In that case the ground for quashing the indictment was not only properly framed and made, but the motion was made and the right invoked at the proper time and not after arraignment, and the case had been continued for perhaps more than one time, but which later dereliction was true in this case.

Section 157 of our Criminal Code of Practice says:

"Upon the arraignment, or upon the call of the indictment for trial, if there be no arraignment, the defendant must either move to set aside the indictment or plead thereto."

In this case instead of moving to set aside the indictment appellant first entered his plea thereto, but after both arraignment and plea had been made and a continuance of the case until the next term of the court. In the case of Taylor v. Commonwealth, 90 S. W. 581, 28 Ky. Law Rep. 819, the same question now under consideration was before us. The motion to quash the indictment or to set it aside, was belatedly made therein —as is true here—and in upholding the action of the trial court in overruling that motion we said (page 584):

"We think the court properly refused to set aside or quash the indictment for alleged informality in the organization of the grand jury. Section 157 of the Criminal Code of Practice provides that, 'upon the arraignment, or upon the calling of the indictment for trial, if there be no arraignment, the defendant must either move to set aside the indictment or plead thereto.' In this case the defendant was arraigned in December, 1904, and pleaded not guilty. He made a motion for a continuance, and also a motion for a change of venue after arraignment, and it was only after the last motion had been overruled that he withdrew his plea of not guilty and entered a motion to quash the indictment. This came too late. Commonwealth v. Smith, 10 Bush. 476; Commonwealth v. Pritchett, 11 Bush 227; Haggard v. Commonwealth, 79 Ky. 366; Sutton v. Commonwealth, 97 Ky. 308, 30 S. W. 661 [17 Ky. Law Rep. 184]; Commonwealth v. Adams, 92 Ky. 134, 17 S. W. 276 [13 Ky. Law Rep 440]. The defendant could not, by withdrawing his plea of not guilty, enlarge the statutory time in which he was allowed to move to quash the indictment."

That holding was reaffirmed by us in the case of Smith v. Commonwealth, 91 S. W. 742, 28 Ky. Law Rep. 1254. For such reason alone this alleged error is unavailable.

But it is also unavailable for another reason, which is, that the only manifestation of the facts upon which it was based is an unverified statement of appellant's counsel unfortified by any affidavit—or even statement —of the accused. His mouth remained closed with reference to any fact towards establishing the ground for the motion. Neither is there any other evidence offered, through any other channel, that any such invol-

untary appearance by appellant before the grand jury was made, or that he even testified at all before the grand jury. It is, therefore, clear, for the reasons stated, that this ground is unsustainable.

## The Demurrer to the Indictment.

There were four counts to this indictment. In the first, all three of the indicted defendants are charged with having done this murder pursuant to a conspiracy. In the second count it was charged Luther Salyers did it, and the other two were present, aiding and abetting. On the third count it was charged that Johnny Hamilton did it, with the other two present, aiding and abetting, and in the fourth it was charged Virgil Salyers did it, and the other two were present, aiding and abetting.

Both appellants demurred to the indictment, the court overruled that demurrer, they allege this was error, and rely upon and cite the case of Taylor v. Com., 90 S. W. 581, 28 Ky. Law Rep. 819. This case was in effect overruled by the case of Ray v. Com., 230 Ky. 656, 20 S. W. (2d) 484, 66 A. L. R. 1297. This Taylor Case was then fully considered by the court, and is cited in the dissenting opinion.

## Alleged Incompetent Evidence.

Virgil and Luther Salyers were arrested by the deputy sheriff, A. D. Westley, and he was introduced as a witness by the Commonwealth. He produced and exhibited in court a blackberry bush, which was cut or pulled up on the 27th or 28th of May, at or near the place where Milford Hogue said he was when he was shot. This bush Westley testified was in the same condition as when he got it, and it gave some indication of having been struck by something; but the sheriff testified he was unable to say it had been struck by a shot. The bush was exhibited to the jury, and it could draw its own conclusions.

A line was stretched from the point where the shot was found in the back fence to this fence corner where some one had stood, and this is copied from Westley's testimony:

"Q. When did you find this brier, before or after you stretched the line from the fence corner? A. After.

"Q. Had the line been taken down? A. It had not.

"Q. Was it stretched tight? A. Yes.

"Q. How far was the brier standing from the line? A. Set close to the line and about the same height as the line.

"Q. I'll ask you if a fellow had been standing where this fellow said he stood if he would not have hit this fence several panels below where the shots were found? A. It would have been below."

The defendants moved to strike out all of this man's testimony about this brier, and the court overruled that motion. The sheriff found this brier four months after this shooting, but that lapse of time affects the weight to be given to this testimony rather than its admissibility. The court did not err in allowing the testimony to go to the jury.

### Alleged Misconduct of the Jury.

The defendants filed the affidavit of one J. Clyde Cundiff, in which he says that one evening during the trial one of the jury was separated from the sheriff and other members of the jury at the hotel and was in the restaurant down stairs while the sheriff and other members of the jury were up stairs.

This juror makes an affidavit regarding the occurrence in which he says:

"The affiant, Bud Helm, one of the jurors in the trial of the above styled cause at the present term of this court says that he was at no time while at the hotel or other places out of the presence and hearing of the deputy sheriff in charge of the jury; that during all the time the jury was out of the courtroom they remained together and did not talk to any person other than the members of the jury and the deputy sheriff in charge of them unless the said deputy was present and heard the conversation. He says that in going up and down stairs leading to their room it was necessary that they pass up and down in single file, but the said deputy was in sight or hearing. This affiant says he did not discuss the case with any person outside of the jury room, and no person outside the jury room discussed the case with him or even attempted to

in any way. He says that he did not separate himself from the balance of the jury and pass out through the restaurant or anywhere else. That he saw no member of the jury absent himself from the presence of the remainder of the jurors. That he, nor any member of the jury that he saw, did not talk to any person during the time the jury was out of the courtroom, unless the sheriff was present and heard the conversation.''

Hon. J. C. Carter, the presiding judge of the circuit court, overruled the motion for a new trial, and made and placed upon the record of the court this statement:

''The court after considering the affidavit of Clyde Cundiff states that he was present when Bud Helm, Juror, was some distance behind the rest of the jurors when they came from supper up the steps to their room and I remarked to Clyde that the sheriff must keep them closer together and from this I knew Helm was the juror to whom he referred. I roomed just across the hall which is narrow, from where the jury roomed and the jurors were in the room and hall and in charge of the sheriff and could be seen by him at all times and I am sure no one spoke to them about the case.''

The defendants make this further charge of misconduct on the part of one of the jury:

''Luther Douglas, who was a bystander and a member of the trial jury after this offense was committed was in jail and conversed with the defendant Virgil Salyers and asked him about the killing with which he was charged and said defendant told said juryman about the case. That when said Douglas was called as a juryman defendant Virgil Salyers who was not acquainted with said Douglas did not recognize him as the man he had talked to in the county jail, and did not disclose said transaction either to his counsel or to his codefendant Luther Salyers, and said juror failed to disclose these facts although asked about his knowledge of the case on his voir dire.''

If this juror had remembered this conversation, he should have disclosed it on his voir dire examination, and if he had we are quite sure he would have been

excused. He had perhaps forgotten the matter just as the defendant says he had, but certainly the defendants cannot contend that a conversation with one of them prejudiced the juror against him. We find no showing of any misconduct on the part of the jury prejudicial to defendants.

## Motion for Peremptory Instruction.

Both defendants sought directed acquittals, and each is contending the court erred in not directing the jury to acquit him. We will consider first the motion made by Virgil Salyers, and will cite as a complete answer to that the following, which is taken from Simmons v. Com., 207 Ky. 570, 269 S. W. 732, 735:

> "The commonwealth had proved that Dugard was dead, and that Simmons had admitted killing him by shooting him with a pistol. With these facts established, it could not be said that there was no evidence of the guilt of Simmons. Simmons' admission that he killed Dugard made it incumbent upon him to justify or excuse his act by evidence."

This case has been cited often on this point. See Fleming v. Com., 219 Ky. 697, 294 S. W. 153; Ferguson v. Com., 224 Ky. 151, 5 S. W. (2d) 897; Barton v. Com., 238 Ky. 356, 38 S. W. (2d) 218; Hensley v. Com., 241 Ky. 367, 43 S. W. (2d) 996; Parker v. Com., 245 Ky. 623, 54 S. W. (2d) 21; Kirk v. Com., 247 Ky. 666, 57 S. W. (2d) 658; Lickliter v. Com., 255 Ky. 471, 74 S. W. (2d) 918; Francis v. Com., 260 Ky. 590, 86 S. W. (2d) 310; Davidson v. Com., 261 Ky. 158, 87 S. W. (2d) 119; Drake v. Com., 263 Ky. 107, 91 S. W. (2d) 1009.

Luther Salyers insists the court should have directed the jury to acquit him because there was, as he says, no evidence that he had anything to do with this shooting other than he happened to be present when it occurred. From examination of the record we find that Luther Salyers and Milford Hogue had had previous trouble and courthouse experiences about the use of this passway. He had as much motive for this homicide as Virgil had. Hogue was killed by a gun belonging to Luther which Virgil procured the evening before. The ammunition for it was bought the evening before. They came to the place of the homicide together, and after the fatal shooting they left together, and went to

Luther's home. Neither offered to assist the wounded man. There was evidence from which the jury could infer they had agreed that Virgil should conceal himself in this fence corner and from that ambush shoot Hogue when he came out to feed his sheep, while Luther remained in the passway to watch for and give notice of the approach of any chance travelers who might happen along and hold himself with his rifle in readiness to render aid if it should become necessary.

The judgment is affirmed as to both appellants.