## Baxter v. Commonwealth.

Oct. 23, 1942.

A. B. Thomason, Lassere Bradley, Burnett Dadisman, and Delmer D. Howard for appellant.

Hubert Meredith, Attorney General, and W. Owen Keller, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER— Affirming.

This appeal is companion to Penney v. Commonwealth, 292 Ky. 192, 166 S. W. (2d) 18, and Anderson v. Commonwealth, 291 Ky. 727, 166 S. W. (2d) 30, growing out of convictions for the murder of Marion Miley on the morning of September 28, 1941. The trial for conspiracy beginning on December 15, resulted in a verdict and consequent judgment of guilty, with sentence of death. It is not necessary to state facts and circumstances relating to the corpus delicti, the preparation for and consummation of the crime; they are detailed in the Penney opinion. As in that case, the accused being unable to employ counsel, the court appointed members of the local bar to represent him.

In support of motion for a new trial counsel set up numerous grounds. In brief the grounds presented are: (1) The court erred in permitting the introduction of incompetent evidence calculated to create prejudice against appellant. (2) The evidence fails to sustain the charge of conspiracy to commit the crime charged. (3) The accused was denied his constitutional rights because one of the jurors, selected from special Fayette County venire was a resident of another county. (4) A statement made by the court during trial in the hearing of the jury was prejudicial to defendant's substantial rights, and in a general conclusion a charge of improper argument of the prosecuting officer, and insistence that at the time of the alleged agreement with his co-defendants, Baxter was not capable of normal mental thinking or acting.

On his trial witnesses testified substantially as in the Penney case. Penney was introduced as a witness for the Commonwealth and insofar as the evidence showed Baxter's suggestion of the plan, the part he was to take, and his actions and activities, it was without material variation. There were no objections offered to any questions or answers which connected Baxter with the offense, though there were a few interposed to questions not material to consideration of the case. The witness was put through a lengthy cross-examination, and his story as to Baxter's connection was not shaken in any material point. It did develop that Penney was slightly acquainted with the Club property, and that he and Anderson did not carry out an agreement with Baxter to divide the spoils.

Appellant, about 27 years of age, was a native of Fayette County, and had attended the grade schools. He detailed the different classes of work he had engaged in and places where he had worked. He was in California in 1939, and the latter part of the year came back to Lexington and began work at the Club, first caddying later caring for the greens, and assisted in parking cars around the clubhouse when there was a dance or party; his employer was Mrs. Miley. At the time of the homicide he had extra work as night watchman at the driving range, a short distance from the clubhouse. He said he was addicted to the use of intoxicants and smoked marijuana cigarettes quite frequently when he was "drink-

ing a lot.'' He went into details as to the effect, particularly when the combination was used.

Coming to the date of the homicide, he said he remembered the ''day and night before.'' He recalled that he went to Joyful Inn and later to Ma Gabbard's roadhouse, which he said he frequented. He had been introduced to Penney ten or twelve weeks before the date of the homicide, and saw him afterwards at Kozy Inn, when Penney asked witness if he knew of any work or chance of getting work at the Club; he told him that there was none right then. Penney said, ''there ought to be some money out there,'' whereupon Baxter left the place.

The next time he saw Penney was the night before the homicide, at the Gabbard place, and around ten or eleven o'clock. A strange man came in and said Penney was outside and wanted to see him. (Penney says he had told Anderson how to identify Baxter). He says later this man was Bob Anderson. He went out but did not ''to his knowledge'' get in the car where the two found Penney, who asked him ''are you going to work tonight?'' to which he replied that he was, at about two o'clock; Penney replied, ''I will be seeing you out there.'' He left about midnight to go to the range in a car with Earl McConnell and Margaret Folger. After arriving there he got in Mr. Bernie's car and went to Joyful Inn, where he says he drank and smoked marijuanas. After that his mind was blank; the next time he remembered anything was when he woke up in the car in the middle of the driving range.

In the car with him were Thelma Truitt, Margaret Folger and Jimmie Hilen. As soon as he awoke he went to the clubhouse to see about the sprinklers, and found the existing disturbance and disorder. He says he was arrested on October 17, early in the morning and ''they checked me in on a murder charge, and put me in a cell,'' and that he had been drinking and smoking the drug cigarettes the night before.

He then undertakes to show that the officers, about dark that night, accused him of the murder; said that he would ''burn for it,'' and plied him with questions until he became frightened. He says he signed a statement, but did not know its contents. The statement was written on a typewriter in his presence. He insisted that while he ''looked over the notes,'' he did not now re-

member what was in the statement.

Appellant was put through a lengthy cross-examination, in which he fairly well stuck to his story, though admitting that he remembered quite a number of things which had transpired the night before the homicide, which were apparently considered by him as immaterial. It seems that he remembered practically everything up till the time he left the driving range to go across from Joyful Inn, a short distance away. He did not deny, but plead entire lack of memory of every act, or word attributed to him by Penney, except the former meetings with Penney, and the time he was called from the roadhouse. Asked specific questions as to acts, words and circumstances, he responded with one answer, "I don't remember."

Reverting to the evidence of the Commonwealth for the moment, we find Jimmie Hilen testifying that before midnight he was at the driving range when two men drove up in a blue Buick and asked for Baxter. At twelve o'clock he went to Joyful Inn, just across the road from the driving range. Baxter came in with McConnell and the Folger girl. Witness got in Bernie's car with Baxter, a girl and another boy. Baxter was drinking but not drunk. They went to Ma's Place, Baxter (at all times) driving the car. There they took up the Truitt girl and went back to Joyful Inn, then across the pike to the range, where two of the parties got out and went to a trailer, leaving the other two in Bernie's car.

Afterwards they all went over to the Club, parking in the driveway. Witness saw the Buick parked there, the same car he had seen when the two men called earlier for Baxter at the range; it bore a Jefferson County license. Baxter got out and went to the parked car, remaining a short while. He then got back in Bernie's, or another car. Baxter said that Floyd Poynter and his girl were in the strange car. Poynter testified that he was not on the Club grounds at any time that night. After Baxter came back to Bernie's car, they drove toward the pump house, Baxter turned his lights off; left the car and said he would be back in a few minutes, and went in the direction of the caddy house not far from the clubhouse. When he came back witness was asleep. When he awoke the car had been driven to a point near the tool house, and the first thing he saw was Baxter and the Truitt girl getting out of a truck. They all got in

Bernie's car, Baxter driving, and went back to the range, where he saw a "big car" blinking its lights. Baxter went to the car and spoke to some one and came back. Their movements thereafter are not of importance. This witness was in part corroborated by Margaret Folger and others, who were in the party at various times.

Earl McConnell, who was with Baxter from 7:30 to 11:00 says that they were continuously drinking beer at the two places, Joyful Inn and Ma's Place. He did not see Baxter drink whiskey, nor rolling any cigarettes. Stella Sloan also introduced by defendant, was the proprietor of Joyful Inn; she said that Baxter was in her place two or three times on the night of the 27th; that he was drinking, but "I don't know whether he was drunk or not." She saw him last sometime between twelve and one o'clock; "he was drinking, that's all I know about it; you could see that." Ma Gabbard said that he was in and out of her place on the night of the homicide, from eight until about one o'clock. She served no whiskey, but said that Baxter looked like he was drinking. She had also seen Anderson and Penney at her place around one o'clock that night.

With this statement of what we deem pertinent testimony, we take up in order the alleged errors. It is argued that it was prejudicial to allow Maupin, the investigating officer, to go into a detailed account of what he found in making the investigation, including description of the premises as he found them on the morning following the homicide, the introduction of exhibits, and the frequent references to the presence of much blood. Objections were made to "this line of testimony," but not all; the court overruling objections.

It is not contended that Maupin's descriptions were not accurate, or that he misstated any fact in giving his testimony. The objection is that it was not necessary to detail these matters since appellant was not present in the apartment at the time of the homicide. What we said in regard to the same character of testimony in the Penney case is applicable here, unless it be the law that in a case where conspiracy, as well as aiding and abetting, is charged, and in which case the aider is a principal, it be error to prove the corpus delicti, and give such proof as shows the enormity of the crime.

Counsel for appellant refers us to no case which so

holds, but does point to McKay v. State of Nebraska, 90 Neb. 63, 132 N. W. 741, 746, 39 L. R. A., N. S., 714 Ann. Cas. 1913B, 1034, wherein the court in a case (not conspiracy) where there was some doubt as to whether the deceased was murdered, or had taken his own life, a circumstantial case, held that to admit blood stained garments, and "flaunting them before the jury," as the court concluded, tended to inflame the minds of the jury and constituted error. It may be that this evidence was "needless," but the question is, did it amount to prejudicial and reversible error?

Counsel for the Commonwealth cited us to several cases wherein we have held that it was not error to introduce clothing, an ax, a portion of the body, and to describe the conditions of places where homicides were committed; in most of these cases there was a purpose to show the manner of commission of the crime. In one case, however, and a conspiracy case, we held it not error to introduce a gun with bullet dug from the ground of the scene of the shooting. Crawford v. Com. 242 Ky. 458, 46 S. W. (2d) 762. Here the objection was that it being assumed that Baxter was being tried solely on a conspiracy charge, the proof of overt acts and circumstances attending them, and descriptions were both prejudicial and "needless" to convict on that charge. Counsel overlooks the fact that under the indictment and the proof, appellant might have been convicted as an aider or abettor, under our law, a principal. Ky. Stats., sec. 1128. Hogan v. Com., 230 Ky. 680, 20 S. W. (2d) 710; Sumner v. Com., 256 Ky. 139, 75 S. W. (2d) 770. He was indicted for a conspiracy to rob the Miley apartment, and robbery (with weapons) developed, all as a consequence of the agreement which he set in motion, and the murder of an innocent person.

Appellant, as is shown by proof, not only suggested the idea of robbery, but assisted in carrying it into effect. He knew, or should have known, that in committing robbery with deadly weapons, death or injury of persons on the premises is likely to occur and if so, there is blood. Under the law he was and is as much responsible for the blood as the one who fired the weapon, and if in proving the corpus delicti, describing the scene, or exhibiting the photographs, it became necessary to show the enormity and maybe uselessness of the crime of mur-

der, he should not complain as long as the testimony truly depicted circumstances and conditions.

The second contention is that the evidence does not sustain the charge of conspiracy. Counsel correctly contends that there was no direct showing that Baxter was present when any of the shots were fired or blows delivered which caused the death of Marion Miley, or the purpose to use weapons. On this point counsel cites Hurst et al. v. Com., 284 Ky. 599, 144 S. W. (2d) 520, wherein it was shown that one Broyles was indicted with Hurst and another on a charge of conspiracy to commit the offense of malicious wounding. Judgment was reversed solely on the ground that the court failed to give an instruction under Section 241, Criminal Code of Practice (effect of accomplice testimony).

The only proof we found as to any act of conspiracy on the part of Broyles was to the effect that he was found in Hurst's car after the shooting by either Hurst or Rue. We said: "There is no evidence whatever that Broyles fired the shots and none indicating that he conspired with either Hurst or Rue to do so." We shall not quote further; the obvious distinction in the above case makes comment unnecessary. Nor is it necessary for us to do more than refer to the statement of facts, supra, to reach the conclusion that the conspiracy was amply proven by the testimony of Penney, and other circumstances tending to connect Baxter, the only question with regard to proof being whether it was true or false, a matter solely for the consideration of and solution by the jury.

The testimony of appellant was not convincing enough to create a reasonable doubt as to the truth of Penney's version of the acts on his part which constituted the conspiracy. We are not called upon to go further into analysis of the proof. A reading of cases in which proof of conspiracy was the involved point will demonstrate the views of this and other courts as to the character and quality of evidence necessary to establish conspiracy. These will show the rule to be that while conspiracy may not be established on suspicion or merely by proof of suspicious acts, it may be proven by circumstances where they are such as to be so unequivocal and incriminating as to remove reasonable doubt of innocence. Exemplary are the recent cases: Lester v. Com., 284 Ky. 352, 144 S. W. (2d) 808; Ashley v. Com., 283 Ky. 835, 143 S. W. (2d) 726, and numerous cases cited

under Conspiracy, 5 Kentucky Digest, Key 47.

Here we are not relegated to consideration alone of proven circumstances; there is in addition the statement of Baxter made on October 17, properly (after inquiry in the Judge's chambers) admitted as evidence, in which he made statements, not of circumstances, but of acts and conversations which showed that he was an active partial participant, and was to receive a portion of the loot.

It is next urged that Baxter's constitutional rights were prejudiced by the fact that of the special venire, one who appeared and served on the jury was a resident of Jessamine County. This contention was not raised until after verdict, set up as a ground for a new trial, supported by an affidavit in which it was also stated that neither the Commonwealth's attorney nor counsel for defense inquired on voir dire as to Harrod's place of residence. It is not claimed that had the fact been known he would have been rejected for jury service. Counsel quotes from the 6th amendment of the Constitution of the United States, which provides that one accused of crime shall be entitled to a speedy public trial "by an impartial jury of the State and district wherein the crime shall have been committed;" it is not necessary to discuss the effect of this provision of the Federal Constitution, nor the ruling of the court in the cited case of United States v. Peuschel et al., D. C., 116 F. 642. The provision does not apply, and the case cited did not deal with the formation of a jury in the Federal Court.

Section 7 of our Constitution preserves to one accused of crime the sacred and inviolate ancient mode of trial by jury, subject to constitutional modifications. Notes to this section include cases in which we have held the section to have been violated, as well as contra cases. In Wendling v. Com., 143 Ky. 587, 137 S. W. 205, 207, we gave our expression as to what was the ancient mode of trial and what we found to have been the fundamental principles, and concluded that "the qualifications of the juror or the manner or mode of his selection were never regarded as being controlled by this section." This construction was upheld in Branham v. Com., 209 Ky. 734, 273 S. W. 489, and referred to in Jackson v. Com., 221 Ky. 823, 824, 299 S. W. 983, though in the latter case we held the provisions of the section supra violated where

it appeared that appellant was convicted by a jury of only eleven members.

By Section 11 of our Constitution, among other rights vouchsafed to one on trial for crime is that he shall be tried by an impartial jury "of the vicinage," saving to the law-making body the right to provide for a change of venue. Authorities differ as to the technical meaning of "vicinage" as used in constitutions or statutes. The term is dealt with at length in Am. Jur. Vol. 31, "Jury," p. 563. Without quoting, it was noted that the rule at common law that a jury must come from the vicinage was obviously developed and adhered to so that an accused should be tried in his own neighborhood, to allow him the advantage of his good character and standing in his vicinage; to be tried by jurors who knew him. It has been suggested that the true construction of the word, as used in the Constitution, was that it corresponded with the territorial jurisdiction of the court in which the venue of the crime was laid. See Com. v. Jones, 118 Ky. 889, 82 S. W. 643, 4 Ann. Cas. 1192. In Shelton v. Com., 224 Ky. 671, 6 S. W. (2d) 1094, 1096 (murder trial) the question arose as to whether a juror was or was not a resident of Whitley County. The juror claimed that he was a resident of Whitley, temporarily residing in another county. This court thought the proof showed the juror to be a Whitley resident, but said: "But, if he was not, a new trial should not have been granted solely because a juror was incompetent on account of his being a nonresident of the county." Citing 16 C. J. 1156; Brown v. State, 105 Ga. 640, 31 S. E. 557; Carson v. Pointer, 11 Ala. App. 462, 66 So. 910. It was here shown that the Jessamine juror lived nearer to Lexington than did many of the accepted Fayette jurors.

It is clear from the above that the fact that a nonresident of the county sat on the jury, violated no constitutional rights, so we need not consider whether or not there was a waiver of such a right by failure to inquire or challenge on voir dire examination. Respectable authorities hold that there may be such waiver on failure to inquire. Am. Jur. 31, Sections 14-66. Our statutes relating to selection of jurors, of course, require the names from which the jury is selected to be drawn from those of residents of the county; and when there exists certain grounds the court may order a venire from another county, which need not be adjoining. Criminal

Code of Practice, sec. 194; Frasure v. Com., 180 Ky. 274, 202 S. W. 653. Section 2253, Ky. Stats. provides that the fact that a person not competent is serving on a jury, shall not be cause for setting the verdict aside, nor shall exceptions be taken to any juror for such cause after the jury is sworn. Winchester v. Com., 210 Ky. 685, 276 S. W. 575; Horton v. Com., 254 Ky. 443, 71 S. W. (2d) 984. From what is said above it is clear that this statute is not unconstitutional.

It is lastly contended that a statement of the court made during trial was prejudicial. Maupin testifying, was shown pistols which had been recovered when he and Penney went to Louisville for the purpose of discovering or recovering the used weapons, and asked if the automatic was one of the pistols. He identified it as being one which was filed as an exhibit in the Anderson and Penney cases. Counsel objected to the introduction and statement "unless they can be connected in some way with the defendant Baxter." The commonwealth attorney then remarked: "We have already shown his connection with the crime," and the court said: "It has been shown that he entered into a conspiracy with his co-defendants to commit this crime. I will have to overrule the objection," to which remark there was an objection. The objection suggested in brief was not incorporated either in the original or amended grounds for new trial, therefore not reviewable by this court on appeal.

In conclusion in addition to relying upon alleged errors above mentioned, counsel saying that while they have no doubt of Baxter's sanity, insist that he was incapable of entering into the conspiracy because his brain was so befuddled by the use of aspirin, whisky and marijuana smoking that "he seldom had a normal mental process." No testimony other than his own was adduced on the subject, and the greater portion of his was in relation to his use of the claimed mentally destructive elements on the evening preceding the homicide; not the time nor times when he, with Penney, formulated the conspiracy, which under the proof he never abandoned.

Whatever might have been the effect, or his claim to have been affected at any time during the involved periods, his rights under this plea were preserved to

him in a correct instruction to the jury. It may be true, as said by counsel, that appellant was not responsible for the murder of Miss Miley, if they use the word to mean that he did not actually fire the shot or was not present at the time. But he was, according to proof, responsible for suggesting the thought, and carrying out the plan which resulted in robbery ending in the death of the innocent persons by whom he was employed.

The record shows that the court used his efforts to see that appellant had a fair and impartial trial. He gave him the benefit of able counsel who have conscientiously looked after his rights, and every instruction to which the proof entitled him. The penalty is the severest, but under the facts and circumstances seems justifiable; no doubt every appeal was made to the jury to temper justice with mercy. The degree of punishment inflicted is always a matter for the jury, which can only be disturbed by us when the evidence fails to support the verdict, or there is error resulting in prejudice to substantial rights. The serious responsibility resting upon the court in this, as all cases where the death penalty is inflicted, demands, and has here received careful consideration of the record in determining whether or not prejudicial error was committed. We have failed to find any such error, hence the judgment must be and is affirmed.

Whole Court sitting.