## Anderson v. Commonwealth.

Oct. 23, 1942.

W. Clarke Otte and S. Rush Nicholson for appellant.

Hubert Meredith, Attorney General, and W. Owen Keller, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—
Affirming.

This is an appeal from a judgment rendered upon a verdict declaring appellant guilty of the murder of Marion Miley and inflicting the death penalty. Appellant, indicted with Thomas Penney, and Raymond Baxter, were tried separately; the latter were found guilty with like penalties inflicted.

Opinions in the Baxter (Baxter v. Com., 292 Ky. 204,

166 S. W. (2d) 24) and Penney (Penney v. Com., 292 Ky. 192, 166 S. W. (2d) 18) cases this day decided, will be found following this; we make reference to the Penney case for detailed statement of facts relating to the condition of the Miley apartment in the clubhouse of the Lexington Country Club on the early morning of September 28, 1941, and to testimony of Penney connecting Anderson with the crime.

We shall detail only such testimony as appears necessary in considering grounds set up by counsel as constituting errors, which in substance are: Errors of the court in: (1) failing to instruct the jury on the whole law of the case; (2) overruling appellant's motion to direct a "not guilty" verdict; (3) admitting incompetent prejudicial evidence; (4) failing to admonish the jury prior to various recesses of the court and upon final submission; (5) failure to admonish the jury as to the effect of testimony of witnesses who said that accused had been an inmate of the State prison, and lastly, error of the court in overruling motion to quash the indictment.

We shall take up this ground first, since consideration does not depend upon facts other than as shown by the court's record of procedure. Counsel contends that the order calling the "special term of court" failed to comply with 23.110 et seq., KRS (Section 971-13, Ky. Stats.) which requires the court in calling a special term to designate in order and notice the style of each case to be tried, and motions to be made or judgments entered, further providing that at such term no other case shall be tried unless by agreement of parties. Counsel misconstrues the state of the record which does not show an order calling a special session of the Fayette court, which is a court of continuous session. 23.050 (22), KRS (KS Sec. 965-22). The order merely discharged a grand jury empaneled prior to October 27, 1941, which had consumed its allotted time. It directed the empaneling of a "special grand jury," to complete what the court considered unfinished business of the discharged body, which met on October 27, and returned the instant indictment.

The section of the statute relied upon by appellant, relates to trials and not to action of a grand jury, regular or special. The action of the court was authorized by 29.240, KRS (Section 2251, Ky. Stats.) under which the court in its discretion, in case of emergency may call

not more than three special sessions of a grand jury in one year. We note that motion to quash was not made prior to time of arraignment (Criminal Code of Practice, sec. 157); Ridings v. Com., 245 Ky. 22, 53 S. W. (2d) 190; Salyers v. Com., 274 Ky. 284, 118 S. W. (2d) 208. Disregarding the failure to follow required procedure, the objection is untenable because of our ruling in the case of Taylor v. Com., 256 Ky. 667, 76 S. W. (2d) 923, which counsel concede to be persuasive and we hold conclusive.

The propriety of the court's adverse ruling on the motion for directed verdict, made at the close of commonwealth's evidence, and renewed when all proof was in, depends upon and requires a recital of evidence, some of which is not common to that in the Penney or Baxter cases. Anderson did not testify. Following his arrest he had made a voluntary statement to the officers, in which he denied that he was in Lexington at the time of the homicide, and asserted absolute innocence in the preparation for or participation in the crime, or knowledge of either; a claim of alibi.

The statement was read to the jury, following other testimony showing the condition of the premises on the morning of September 27th; introduction of numerous exhibits, and proof of witnesses as to the identity of the car which was used by the persons engaged in the robbery, and the testimony of Penney. It developed from the statement that appellant, with his brother Andrew, operated a saloon and dance hall at 19th and Main Streets in Louisville, called the "Cat and Fiddle," to the operation of which appellant gave more attention than the brother, who had other business. Appellant first gave his movements during the day (27th) and up to 10 p. m., following his usual customs. At ten o'clock he got into his car, a gray-blue 1941 Buick, and drove to a liquor store at 15th and Market, and bought a case of whisky from a man named "Jake." (It was later developed that this was Jacob Ashkenaz, operating a drug store at the address). He returned to his place about 11 p. m., and was there until 2 p. m., about which time he checked his cash register and went to bed. He arose the next morning around 10 a. m., and later he and his wife went to appellant's camp up the river, returning home about 1 p. m. At 9 p. m. he learned from a newspaper that there had been a "shooting and murder in Lexington."

He then takes up his acquaintance with Penney, "a boy that I had met in the Frankfort penitentiary." On September 22d or 23d Penney walked into the saloon and they had some conversation about Penney's personal affairs. Penney asked for a job; Anderson told him Andy did the hiring and he would see him. Penney was broke and Anderson gave him a dollar. Penney returned the next day; Anderson told him he could not hire him just then. "He asked me if I would be interested in a barrel of whisky and I said I would; Penney then said he could get three barrels," at what appeared to be a low price. Penney had no sample, but Anderson arranged to and did meet Penney at an appointed place where Penney left the car, and in ten minutes returned saying he could not get a sample. This trip, and for the same purpose, was repeated the next day with like result. Later Penney reported to Anderson that he thought he could make the deal; Anderson turned his car over to Penney, and told him to get the whisky and bring it back. Penney came back with a sample, which Anderson examined and pronounced moonshine. Penney insisted that it came from a distillery in Carrollton. There was no deal. Later Penney called and Anderson told him to come to his place. Penney came and offered the whisky at $2 per gallon, but Anderson said he could not use it; they separated and Anderson said that he had not seen him since that afternoon.

With relation to the car later found in the possession of Penney in Fort Worth, Anderson said that after he got the whisky from Jake on Saturday night, he parked his car near his place and locked the doors, but was not sure he had locked the ignition. He shows no further use of the car unless it was to go to the camp on Sunday. However, he says that on Tuesday he went to his room at 5:30 to rest. His wife woke him about eight o'clock and told him "that scarfaced s. b. is fooling around with your automobile." His wife took the keys and put them in her pocket. Mrs. Anderson and her sister-in-law went to a picture show; Anderson met them at the show, and all returned at midnight in a taxi. Anderson did not look to see if his car was parked where he had left it. He went to bed at 1 p. m., and Andy came in the next morning at 7; Anderson asked him to take some whisky from the garage, put it in the truck, and take it to Henry, another brother. "I told him I did not

want to put the liquor in my machine.'' Andy told him the car was parked at the time. At ten o'clock Anderson arose and went to a barber shop, ''but did not pay any attention as to whether my car was there at the time. I came back and still did not notice to see if it was there.'' At 10 p. m. he came out of the saloon to get the car and found it gone. He made report to the Detective Bureau. Recalling what his wife had told him about Penney, he suspected him. He did not hear any more about the car until October 8th, when he learned it had been found in Texas.

In closing he denied any knowledge of the Miley case; said that he had not been in Lexington since the latter part of August, when driving through. ''I know of no reason why Penney would want to say that I was with him on the occasion mentioned. I only lent him my car on one occasion to go and get the sample of whisky.''

Before undertaking to detail Commonwealth's evidence we deem it best to present appellant's proof in support of his claim of alibi. His mother, who lived in the apartment above the dance hall with Anderson and his wife, and Andrew and his wife, recalled the night of the 27th, saying she saw appellant around the place at seven o'clock when she went to her room. She retired about twelve o'clock, and about two o'clock she saw and heard Anderson and his wife going to their room. She was unable to give any reason for fixing the particular Saturday night, except that it was his usual custom to retire around two o'clock every Saturday night. Andrew and his wife saw appellant around the club as late as twelve o'clock, when they retired.

In addition to members of the family, there were introduced six or more girls, frequenters of the club, who say they were present the night of September 27, during hours ranging from eight to twelve o'clock, each testifying that during these hours they saw appellant around the club, particularly in the dance hall. The bar tender, Rogers, a brother-in-law, says that Anderson checked the cash register about 1:45 a. m. The majority of these witnesses say that they recalled the particular night because it was ''the night the clock was set back.''

On cross-examination many of the witnesses were unable to give the names of other persons who were at the club that night, and none recalled the date until af-

ter Anderson's arrest on the 12th, and there was some confusion as to whether the date they were fixing was September 27, or the next Saturday night, October 4th. Appellant introduced Ashkenaz, the druggist, who was the "Jake" referred to in his statement, and from whom Anderson in statement said that he had bought whisky around 10:30 on the night of the 27th. This witness says that Anderson, whom he knew, did not come to his store that night "as I know of," but that he was in the store on the night of October 4 and bought whisky; he recalled the night because there had been a street fight, and the officers had arrested a participant who had run into the store.

In rebuttal there were four or more girls, also "frequenters," who say they were at the Cat and Fiddle on this Saturday night, in and around the dance hall, some who were near the table usually reserved by Anderson, and all say they did not see Anderson, whom they knew well, at any time while they were present, from nine until twelve o'clock. Two vice-squad officers visited Anderson's place that night (time not given), but Anderson was not there. They were permitted to say that they made inquiry of his wife as to his whereabouts, but not permitted to give her reply.

Coming now to the testimony of the Commonwealth, we find the testimony of Penney, which up to the point he had related in his own case (infra) was not materially varied. The officers had testified as to the corpus delicti, giving minute details of the situation in the Miley apartment on the morning of the 27th. They introduced numerous exhibits, screen window, pistols, plat of the grounds and many photographs, etc. Cramer the newsboy had testified as to seeing the Buick car at the clubhouse, which from photographs he identified as the same car, also identified in the same manner by some of the young people who had been riding around with Baxter. Anderson was identified by Givens, the drug clerk, who had sold him the flashlight around midnight of the 27th.

Mrs. Gabbard, the owner of the roadhouse, identified Anderson as the man who came to her place and left with Baxter prior to the time of the robbery. Frank Lederson said that he knew Penney and Anderson, and saw them in the Buick car, Anderson driving, around seven-thirty p. m., on the 27th, going east on Market Street, in Louisville.

Anderson in his statement, said that he reported the loss of his car to the Police Bureau on October 1. However, a highway patrolman located in Elizabethtown, said that on October 1, around 7 p. m., Anderson, whom he knew, reported the loss to him. Anderson said that the car had been stolen on Sunday night, and he suspected a soldier of taking it; he described the car as a two-tone Buick 1941 model. He said nothing about making report of loss of his car to the Insurance Company, but an adjuster said that he had heard that the car had been stolen. He went to Anderson's place of business and he signed a report that his car had been taken from 19th and Main Streets on October 1; it was described as above stated. This report was signed October 4. The adjuster asked Anderson if he suspected any one and he said he "had no idea who had taken it."

On October 6, at 8:40 p. m., a telegram came to Anderson's place which was delivered to either Rogers or the brother Andy. This came through the Postal and was dated October 6, at Jackson, Mississippi. A copy produced reads: "Mr. Robert Anderson, care Cat and Fiddle Club, 19th and Main, Louisville, Ky. Had misfortune with fire. Need $15.00 quick. Send by boy care Postal Telegraph. R. T. Hoffman." On the same evening Anderson, by Postal, wired $15 to R. T. Hoffman, Jackson, Mississippi. The money order was cashed October 7, on the endorsement of Hoffman without identification requirement.

Anderson was treated by a local doctor on the evening of the 29th for bruises on his body. The doctor found that he had been bitten on the left leg, which injury Anderson explained by saying he had had trouble in throwing a drunk out of his place and he had bitten him. The doctor thought the stages showed that the injuries had been inflicted within perhaps forty-eight hours.

Penney testified that about September 30, he and Anderson had talked about getting rid of the car; Anderson said it was a "hot" car, and that "someone had seen it there; he wanted me to wreck it; burn it, just anything." Anderson told him to take it and he would give him twenty-four hours before he reported loss. Penney was to go to Anderson's place and get it. He went there and Anderson's wife said it was locked; "she thought I was up to something." Penney left and called Anderson and told him the car was locked. Anderson

agreed to meet him at 18th and Main; met him there and they drove to another point. When Anderson came up a window vent was broken, Anderson saying he had to break it to get in as his wife had the key. At 18th and Maple Anderson left the car and Penney headed south into Tennessee. It was there he said he picked up Hoffman. The two drove to Jacksonville, Florida; then west to some point in Georgia, then to Jackson, Mississippi, where Hoffman sent the telegram, cashed the money order and gave Penney the $15. He was positive that the car he had in Fort Worth was the same car which he and Anderson used on the Lexington trip on the 27th.

He also said that on the return trip to Louisville he and Anderson had buried the two pistols (mentioned in the Penney case) around an old building in a park near Louisville. Penney afterwards took the officers to the place where they found the weapons.

Penney and Anderson were in jail together at Lexington. On his cross-examination (about 70 pages of transcript) which he withstood without being materially crossed, the defense introduced a note which had been passed from Penney to Anderson. This note undertook, in a rambling way, to detail his associations with Anderson. He wrote:

"Haven't seen you since Friday 26th. Had keys made once for your car when I had it borrowed; met Hoffman in Tennessee thru Slick; 38 was in car. Man with black car had 32. Stole your car Sunday 27, 9:40 p. m., returned it before daybreak; then stole it again October 1st and went South. The rest is as is. Never with you in Lexington at nite. I tried to sell you some whisky while I was in Louisville that came from Carrollton, but you wouldn't buy. Wrong color, too new. Thought I saw your wife come in. She does hate me, burns me down ever time she gets a chance to see me; don't think she recognized me at this time as I have a moustache."

Penney admitted writing the note to Anderson in order to "help him if I could," but upon being pressed on re-direct examination he said that the note was in response to some he had received from Anderson. These notes were written at various times and passed over the walls of adjoining cells. Appellant objected to their reading on the ground that it was not shown that the

writing was Anderson's. Penney knew, and said it was his writing and the notes came from the cell occupied by Anderson. When the notes were passed, one or the other would say, "coming over," and when thrown over, "all right." Penney said that Anderson had told him in writing and in conversation what to write down. He was to say in substance, what was contained in the Penney note. Anderson had written "o. k." on the Penney note and passed it back to him.

One of the notes to Penney said:

"My attorney was up yesterday and he is trying to get things together. Baxter got the statement he signed and he said he didn't remember anything; he was full of whisky and luminals for six months."

Another:

"Have you got everything straight? The paper said I would be tried first. If you haven't let me know right away."

Another:

"I am fixing up a letter for you. My attorney said they were going to put you on the stand, and he said it would be better if you took the stand instead of putting it on paper. Answer right away for that would only give them a chance to change their defense and he said he thought they would take you out and try to make you change it again. Let me know if you will take the stand."

Another:

"Don't say anything about the gun unless you are asked. I don't think they have traced it to me. It was under the seat."

The originals were introduced and marked "A-B-C-D-E"; the last one, "E" relating to Penney's taking the stand, and giving "them the chance to change their defense," was admitted without objection. The objection to the others was on the ground of lack of identification.

We conclude that all the notes and the writer were sufficiently identified so as to permit their introduction. Appellent started the "note" controversy, and the Commonwealth had the right to introduce proof in explanation of the one admittedly written by Penney.

Other circumstantial evidence "tending" to con-

nect Anderson, relates to the pistols, particularly to the one said to have been used by Anderson. A salesman of a sporting goods store in Louisville, on May 28, 1936, as shown by his records, sold a 38 automatic to Alex Morris, who shipped the weapon to Wardell Orsbey in Oldham County; Oresby in July, 1941, sold the pistol to Anderson. Both these witnesses identify the pistol, it being the same found by officers in Shawnee Park in Louisville. An expert in ballistics said that bullets found in the Miley apartment were fired from this weapon.

Counsel in argument, admitting that there were several witnesses who say they saw Anderson in Lexington on the night of the 27th, ''which tended to support the proposition that he was there that night,'' totally discredit the testimony and classify it as being ridiculous. This refers to the testimony of the drug clerk who sold the flashlight, and of Mrs. Gabbard. The drug clerk first identified Anderson by a picture in the newspapers. He identified him from the stand, and said he was impressed because of the late hour at which he sold the light, and the fact that it was the first one sold by him since working for the store. It is true that Mrs. Gabbard, prior to the trial, picked from several persons another than Anderson; she insisted, however, that she knew him as being the man who asked for Baxter in her place on the night of the 27th. She said she pointed out the wrong man because she was afraid that Anderson might do her some injury; she had seen Anderson prior to, and twice that night; that he told her his name, and that he had a night club in Louisville.

A reading of Mrs. Gabbard's testimony, particularly that brought out on cross-examination, was sufficiently impressive. The same may be said of the drug clerk's testimony. Whether we give correct weight or measure to this testimony, is not the criterion. Whether sufficient to identify appellant, or was or not so ''ridiculous'' as to be unimpressive was for the consideration of the jury.

The argument that the evidence showed that Penney had access both to the car and the pistol; that the pistol, as claimed, belonged to the brother Andy, created a great doubt; that there was a lack of evidence to fasten the crime on appellant, and totally insufficient to meet the Code requirement as to the necessity of fortifying the confession of an accomplice by extraneous

738

proof, is good only as argument. Our recitation of the evidence, necessarily limited in scope and detail, presents testimony which was amply sufficient to take the case to the jury and fully justified the court's refusal to sustain motion to direct a verdict of not guilty. It also fully met the requirement of Section 241 of the Criminal Code of Practice, according to our repeated construction, of this section. A reading of and comparison with recent opinions on the subject will convince the reader that the evidence here adduced "tended to connect the accused with the commission of the crime." It was amply corroborative of Penney's testimony. See Williams v. Com., 257 Ky. 175, 77 S. W. (2d) 609; Miller v. Com., 285 Ky. 251, 147 S. W. 394, and Haynes v. Com., 286 Ky. 360, 150 S. W. (2d) 925. It is noted that the court correctly gave applicable instruction.

It is next charged that the court failed to admonish the jury properly at times when the court was about to recess. Criminal Code of Practice, Section 246. The chief contention is that the court submitted the case at about 9:30 p. m., and the jury later failing to agree, did not return to the court room until the following morning.

It is admitted that the jury was kept in custody during the entire trial. It is intimated that there were several recesses when the court did not admonish as per Code provisions. We have carefully examined the transcript and find no instance of recessing (and there were several) when the court failed to give the admonition. The particular objection to the alleged action of the jury, after submission, was brought to the attention of the court by affidavit in support of a motion to discharge the jury, which points out that upon submission, about 9 p. m. the jury was placed in charge of the sheriff; at 11:30 the judge left the court room and instructed the sheriff to call him if the jury reached a verdict; that the jury was kept together in the courthouse until 10:30 the next day; that in the meantime the sheriff had taken them to breakfast and they then returned to the courthouse. The sheriff who had charge filed affidavit in which he recounted that the case was submitted as stated, and that he kept the jury continuously together and suffered no communication to or by any member. That the jury slept in the courthouse where beds were prepared for them in one room; that he did take them to breakfast

the next morning where they were all seated together; following the meal they were taken to the courthouse. The officer says he at all time scrupulously followed the orders of the court.

The chief contention seems to be that the jury had opportunity to disregard the admonition of the court. It is not pointed out wherein they did so, either by separation or conversation with others or among themselves, or received evidence outside the portals of the court.

There is a total lack of showing of anything that occurred, during trial or after submission insofar as actions of the jury was concerned, which would in anywise constitute prejudicial error. We may refer to the recent case of Burnam v. Com., 289 Ky. 312, 158 S. W. (2d) 131, citing others, in which we held that in order to constitute reversible error there must have been shown some act, or such a clear violation of the court's admonition, as would under the circumstances constitute error. Bowman v. Com., 284 Ky. 103, 143 S. W. (2d) 1051, and York v. Com., 285 Ky. 492, 148 S. W. (2d) 337.

Counsel does not discuss ground (5) to any length; it is merely said with relation to the testimony of several witnesses, that Anderson had been an inmate of the penitentiary, "We believe the testimony was very damaging and prejudicial to appellant, and that the court erred in not admonishing the jury." We are not pointed to any provision of the Code or Statute, which would require admonition under the circumstances, and the state of the record. There appears no objection to the testimony of Penney and others, who said they had been in the prison with Anderson; furthermore we find Anderson, in his admitted and relied on statement, saying that he first met Penney in the penitentiary at Frankfort.

The final contention is that the court erred in failing to instruct the jury that if appellant committed the act charged in his self-defense, they should find him not guilty, this based on the established rule that where no eye-witnesses were present, and there is evidence of a struggle, the jury should be given the whole law of the case. The rule can hardly be resorted to under the facts of this case. The term "eye-witnesses" does not necessarily mean one who obtains knowledge of an act through the sense of sight alone. One who is able to identify a person by his voice, with which he is familiar, and who

could not recognize the person on account of absence of light, may be in law an eye-witness. Bowlin v. Com., 195 Ky. 600, 242 S. W. 604.

Penney was to all intents and purposes an eye-witness, and from his evidence it could hardly be conceived that either the mother or daughter had placed accused in a position where he had to kill in order to save himself from bodily harm. We could hardly prostitute the principles of criminal law by holding error in this respect; up to this time we have refused to do so, certainly in cases where there is shown a previous preparation to go forth armed with the purpose of and committing robbery where a homicide follows. Keller v. Com., 230 Ky. 815, 20 S. W. (2d) 998, and citations, and the general principle announced in McGee v. Com., 246 Ky. 445, 55 S. W. (2d) 382, 386, wherein we adhered to the rule that one is not entitled to an instruction on self-defense unless the evidence authorizes it, and it must not be overlooked that Anderson relied solely upon his alibi.

In conclusion it was insisted that the proof supporting Penney's incriminating evidence, should be greatly discounted because of his conflicting statements, particularly since appellant proved a complete alibi. Any discounting of evidence was a matter for the jury. As to the alibi, such a defense, arising on the plea of not guilty, is only complete and effective if the jury is satisfied from reasonable and credible evidence that the appellant was at such a point distant from the scene of action as to have made his participation in the crime in some manner impossible. Where the evidence conflicts, the measure and weight is for the consideration of the jury. Whether or not an alibi had been established to their satisfaction was for its determination.

We have given this case, as we do in all death cases, the closest attention. Appellant was represented by able counsel, and we are justified in expressing the opinion that the court used his best endeavors in seeing that he was accorded an impartial trial as we view the record, which is free from any error tending to prejudice the substantial rights of the accused. The penalty inflicted is severe, but does not measure up in severity to the results growing out of formulated plans to rob, followed by robbery, and the commission of the horrible crime detailed.

Judgment affirmed. The whole Court sitting.